Present: Carrico, C.J., Hassell, Keenan, Koontz, Kinser,and Lemons, JJ., and Poff, S.J.

SHORT PUMP TOWN CENTER COMMUNITY
DEVELOPMENT AUTHORITY, ET AL.

v.  Record No. 010456  OPINION BY JUSTICE CYNTHIA D. KINSER
                                        November 2, 2001
ARLIE A. HAHN, JR., ET AL.

FROM THE CIRCUIT COURT OF HENRICO COUNTY
Randall G. Johnson, Judge Designate


In this action, the circuit court invalidated a bond issuance approved by the Short Pump Community Development Authority ("CDA") for the purpose of financing certain infrastructure improvements in conjunction with the development of a retail shopping mall to be known as the Short Pump Town Center ("the Center"). Because we conclude that the CDA is not an entity authorized to bring this bond validation action under the Public Finance Act of 1991, Code §§ 15.2-2600 through –2663, we will vacate the judgment of the circuit court and dismiss the action.

FACTS AND MATERIAL PROCEEDINGS

The Center is a proposed "[h]igh-end, upscale" pedestrian shopping mall that, according to its plans, will contain more than 1.1 million square feet and will be anchored by four major department stores. It is to be located on approximately 147 acres of real estate in Henrico County and developed by Short Pump Town Center LLC

("the Developer").  The Center's location is approximately five miles "straight-line distance" from the Regency Square Mall, also situated in Henrico County.

In July 2000, the owners of the 147 acres petitioned the Henrico County Board of Supervisors (the "Board"), pursuant to the provisions of Article 6 of the Virginia Water and Waste Authorities Act ("WWAA"), Code §§ 15.2-5100 through –5158, to create the CDA.  The stated purpose of the petition was to seek financing and the construction of certain infrastructure improvements to facilitate the development of the Center.

Upon considering the petition, the Board passed a resolution creating the CDA "as a body corporate and politic" for the purpose of "financing, constructing and developing, and owning and maintaining if necessary, certain improvements in connection with the development" of the Center.  Those improvements, as listed in the petition, are the extension of a sewer trunk line and water main line, storm water management facilities, a left turn lane and traffic signal on roads abutting the CDA, a ring road around the Center, entrance roads, lighting, landscaping, a plaza, parking, excavation related to the improvements,

soft costs, and contingencies.[1]  In its resolution, the

Board declared that the creation of the CDA "will benefit

the citizens of the County by promoting increased

employment opportunities, a strengthened economic base and

increased tax revenues and additional retail opportunities

not currently available in the local area" and that the

development "will have limited requirements" for the

services of Henrico County.

On October 20, 2000, the CDA authorized the issuance

of special assessment bonds to finance the requested

infrastructure improvements.  In the same resolution, the

CDA agreed to enter into two other agreements with regard

to issuing the bonds and providing financial incentives to

the Developer.  One agreement was a Memorandum of

Understanding between the CDA, the Developer, the

landowners, and the Board.  The second was an Economic

Development Agreement between the Economic Development

Authority of Henrico County (EDA),[2] the Board, the CDA, and

---

[1] In the past, commercial developers in Henrico County
were required by county zoning ordinances to provide, at
their own expense, the parking, lighting, landscaping,
entrance roads, sidewalks, and pedestrian areas that were
associated with a development.

[2] Pursuant to Code § 15.2-4903(C), the name of the
industrial development authority in Henrico County is the
Economic Development Authority of Henrico County.

3

the Developer. Together these agreements provide that the CDA will issue bonds in an amount sufficient to pay a portion of the costs of the infrastructure improvements, not to exceed 22 million dollars; plus an amount sufficient to pay a portion of the costs of issuing the bonds, the costs of establishing a reserve fund, and the capitalized interest for a period not to exceed twelve months. The bonds will be repaid in approximately five years by special assessments on the properties within the CDA district.[3] The Developer is required to pay semi-annual installment payments on the special assessments to the Board, which will then pay those amounts to the CDA for debt service on the bonds.[4]

Pursuant to these two agreements, the Board will also make semi-annual appropriations to the EDA from the county's tax revenues in amounts equal to the special assessments paid by the Developer. These payments are financial incentives to facilitate the development of the Center; however, they are subject to appropriation by the

---

[3] The special assessments are to secure payment of the bonds and are to be calculated "to correspond to the benefit each parcel receives from the improvements for which [the b]onds are issued."

[4] The payments of annual installments to the CDA are subject to annual appropriation by the Board and do not constitute a general obligation of Henrico County.

4

Board and are capped at the amount of incremental tax revenues generated by the properties in the CDA district. The EDA will, in turn, pay those same amounts to the Developer as reimbursement for the special assessments. However, if any special assessment remains unpaid when an incentive payment is to be made to the Developer, the EDA is required to pay that installment directly to the CDA for application to the debt service on the bonds. Under this financing scheme, it is possible that the Developer would never have to pay a special assessment after paying the first one, but could instead allow incentive payments from the EDA to be used for that purpose. The Developer will also receive reimbursement for the first special assessment approximately six months after the bonds are retired. In other words, if sufficient incremental tax revenues are generated from the properties in the CDA district, the Developer will be fully reimbursed for the special assessments levied to retire the bonds.

In November 2000, the CDA filed an action under Article 6 of the Public Finance Act, Code §§ 15.2-2650 through -2658, seeking to validate the bond issuance and all proceedings, including the Memorandum of Understanding and Economic Development Agreement, taken in connection with the authorization and issuance of the bonds. Two days

5

later, The Taubman Limited Partnership filed a chancery suit against the Board, the CDA, and the EDA (collectively, the "Public Entities"), requesting declaratory judgment that the incentive payments to the Developer and the financing structure of the proposed bond issuance are unlawful and in violation of the Constitution of the United States and the Constitution of Virginia.[5] Taubman also sought injunctive relief to prevent the Public Entities from taking any further action to finance or support improvements at the Center.[6]

---

[5] In the bill of complaint, The Taubman Limited Partnership alleged that it owned Regency Square Mall. It subsequently moved the court to correct a misnomer, asserting that TRG-Regency Square Associates is the real party in interest and the owner of that mall. The circuit court granted the motion and ordered that TRG-Regency Square Associates LLC be identified as the plaintiff in the chancery suit. That order applied only to the chancery suit, and we find no similar order addressing the alleged misnomer in the law action, which is the case on appeal. However, in their response to Taubman's motion, the Public Entities stated that they took no position on the addition of TRG-Regency Square Associates as a new party to the law action, although they objected to treating the motion as one for correction of a misnomer. Subsequently, TRG-Regency Square Associates LLC filed an amended grounds of defense in the law action. For purposes of this appeal, we will refer to The Taubman Limited Partnership and TRG-Regency Square Associates LLC as "Taubman."

[6] Prior to filing its suit, Taubman had discussed plans with the City of Richmond to locate a nearly identical shopping facility within the city limits. Taubman had also unsuccessfully sought similar financial assistance from Henrico County in 1997 to make improvements to Regency Square Mall.

Taubman and three other taxpayers filed grounds of defense in the bond validation action:  Arlie A. Hahn, Jr., Bryan B. Gresham, Jr., and Robert Anderson (collectively, the "Taxpayers").  At the same time, the CDA, along with the EDA and the Board (both of which had intervened as party plaintiffs in the bond validation action), moved to enjoin Taubman's suit and to consolidate the two proceedings.  Taubman opposed consolidation and, in its chancery suit, moved the circuit court to stay the bond validation action.  The circuit court granted the motion to consolidate but denied the Public Entities' motion to enjoin and Taubman's motion to stay.

Hahn and Taubman then moved the circuit court judge to disqualify himself from hearing the bond validation case since, as a taxpayer, property owner, and citizen of Henrico County, the judge was a party defendant to the action pursuant to Code §§ 15.2-2651 and -2652.  After hearing argument on the motions, the circuit court judge vacated the previous order consolidating the two proceedings and decided to continue presiding in Taubman's suit.  The Chief Justice of this Court then designated another circuit court judge to preside in the bond validation action.  After the proceedings were severed, Taubman amended its grounds of defense in the bond

validation action to include most, if not all, of the claims raised in its separate chancery suit.[7]

After hearing evidence in the action filed by the CDA, the circuit court, in a subsequent letter opinion, concluded that the infrastructure improvements to be financed by the proposed bond issuance do not satisfy the requirements of Code § 15.2-5158.  That provision requires, among other things, that the bond-financed infrastructure improvements be "necessary to meet the increased demands placed upon the locality as a result of development within the district."  Code § 15.2-5158(A)(1).  Based on the evidence presented, the circuit court found that only the left turn lane and traffic signal meet this statutory requirement and that all other proposed infrastructure improvements are instead for the Developer's benefit.  In an order incorporating its letter opinion, the circuit court ruled that the bond issuance proposed by the CDA to finance certain infrastructure improvements at the Center is invalid and contrary to law.[8]  The Public Entities appeal

---

[7] Taubman acknowledges on brief that its suit is in abeyance pending this appeal.

[8] Despite its decision invalidating the bond issuance, the court concluded that the bonds serve a public purpose and that the financing arrangements and monetary incentives under the Memorandum of Understanding and the Economic Development Agreement do not violate Code § 15.2-4905.

from that order, and Taubman and the Taxpayers have assigned cross-error.

ANALYSIS

Although there are several assignments of error and cross-error, one of Taubman's assignments of cross-error raises a threshold, dispositive issue:  whether the CDA is an entity that is authorized to file an action under Article 6 of the Public Finance Act to validate its bonds issued pursuant to the provisions of the WWAA.

Taubman first raised this question in a hearing before the circuit court on the Public Entities' motion to consolidate the bond validation action and Taubman's chancery suit.  Later, in its demurrer and motion to dismiss the bond validation action, along with its supporting memorandum, Taubman asserted that the CDA cannot initiate a bond validation action under the Public Finance Act.  In our review of the record, we do not find a specific ruling by the circuit court on Taubman's demurrer and motion to dismiss.  However, the court implicitly overruled the demurrer when it stated in its letter opinion that this action was brought under the Public Finance Act

9

and then proceeded to address the merits of the arguments concerning the validity of the bond issuance.[9]

In claiming that this action was improperly brought under the Public Finance Act, Taubman focuses on two provisions in Article 6 of that act, Code §§ 15.2-2650 and -2651. The pertinent parts of those sections provide:

> The provisions of this article apply to all suits, actions and proceedings of whatever nature involving the validity of bonds of any locality or other political subdivision, agency or instrumentality of the Commonwealth . . . .

Code § 15.2-2650.

> The governing body of any locality or other political subdivision, agency or instrumentality of the Commonwealth proposing to issue bonds may bring at any time a proceeding in any court of the county or city having general jurisdiction and in which the issuer is located to establish the validity of the bonds . . . .

Code § 15.2-2651.

Taubman contends that, under the provisions of these two statutes, only the specified entities, i.e., a "locality or other political subdivision, agency or instrumentality of the Commonwealth," may commence a bond

---

[9] On the first day of trial, the circuit court acknowledged that a demurrer had been filed, and counsel for the CDA and Taubman advised the court that they had agreed to submit the demurrer "on the papers" filed by them. The Public Entities state in their reply brief that the circuit court treated this action as one brought under the Public Finance Act and that all proceedings conformed to the provisions of that act.

validation action.  Continuing, Taubman argues that, unlike many authorities, the CDA is not statutorily denominated a "political subdivison" and thus cannot proceed under Code § 15.2-2651.  Taubman also points out that the WWAA has its own mechanism, set forth in Code § 15.2-5126, for challenging the validity of the CDA's bonds, and contends that that section provides the sole method for determining the validity of the bond issuance involved in this appeal.

Disagreeing with Taubman's argument, the Public Entities assert that the CDA is fundamentally similar to those authorities that have been designated "political subdivisions" by the General Assembly.  Thus, according to the Public Entities, the CDA does not have to be labeled a "political subdivision" in order to avail itself of the bond validation procedure established in the Public Finance Act.  Finally, they posit that Code § 15.2-5126 provides an additional method, but not the sole method, for challenging the issuance of bonds by a community development authority.

We begin our analysis of this issue by comparing the designation given by the General Assembly to the authorities created in the WWAA with that afforded to authorities established in other statutory provisions.  In the WWAA, the term " '[a]uthority' means an authority created under the provisions of § 15.2-5102 or Article 6

(§ 15.2-5152 et seq.)." Code § 15.2-5101. The authorities specified in Code § 15.2-5102 are created to provide water, sewer, sewage disposal, stormwater control, and refuse collection and disposal. That section further states that "[t]he authority shall be a public body politic and corporate." Code § 15.2-5102. Article 6 of the WWAA, Code §§ 15.2-5152 through –5158, deals only with community development authorities. However, unlike Code § 15.2-5102, none of the provisions of Article 6 provides that a community development authority shall be a "body politic and corporate." Nor do those provisions classify a community development authority as a "political subdivision." This lack of such designation for a community development authority differentiates it not only from those authorities created in Code § 15.2-5102, but also from virtually every other authority in the Commonwealth.[10] Indeed, our search of the Code revealed

_____

[10] See, e.g., Code § 5.1-153 (Metropolitan Washington Airports Authority created as a "public body corporate and politic"); Code § 10.1-1601 (Virginia Recreational Facilities Authority created as a "political subdivision"); Code § 15.2-4903(A) (industrial development authorities created as "political subdivision[s]"); Code § 15.2-5302 (hospital authority shall be a "political subdivision"); Code § 15.2-5403 (electric authority shall be a "political subdivision . . . and a body politic and corporate"); Code § 15.2-5604 (public recreational facilities authority shall be a "political subdivision"); Code § 15.2-5702 (park authority shall be a "body politic and corporate"); Code

12

§ 15.2-5801 (Virginia Baseball Stadium Authority established as a "body corporate and politic" and as a "political subdivision"); Code § 15.2-5901 (Hampton Roads Sports Facilities Authority established as a "body corporate and politic" and as a "political subdivision"); Code § 15.2-6200 (Alleghany-Highlands Economic Development Authority created as a "body politic and corporate, a political subdivision"); Code § 15.2-6302 (Authorities for Development of Former Federal Areas created as "political subdivision[s]"); Code § 15.2-6402 (regional industrial facilities authorities created as "political subdivision[s]"); Code § 15.2-6500 (Tourist Train Development Authority created as a "body politic and corporate, a political subdivision"); Code § 22.1-163 (Virginia Public School Authority created as a "public body corporate and an agency and instrumentality of the Commonwealth"); Code § 23-30.25 (Virginia College Building Authority created as a "public body corporate and as a political subdivision and an agency and instrumentality of the Commonwealth"); Code § 23-30.41(a) (Educational Facilities Authority, by reference to the "Virginia College Building Authority created by § 23-30.25," created as a "public body corporate and as a political subdivision and an agency and instrumentality of the Commonwealth"); Code § 23-50.16:3 (Virginia Commonwealth University Health System Authority created as a "public body corporate and as a political subdivision"); Code § 23-231.13 (Roanoke Higher Education Authority created as a "political subdivision"); Code § 36-4 (redevelopment and housing authorities created as "political subdivision[s]"); Code § 36-55.27 (Virginia Housing Development Authority is a "political subdivision"); Code § 62.1-200 (Virginia Resources Authority created as a "public body corporate and as a political subdivision").

Likewise, four authorities established by the General Assembly in statutory provisions effective October 1, 2001 are all explicitly created as "political subdivision[s]." See Code § 2.2-2202(B)(Virginia Commercial Space Flight Authority); Code § 2.2-2219(B) (Innovative Technology Authority); Code § 2.2-2261 (Virginia Public Building Authority); Code § 2.2-2280(B) (Virginia Small Business Financing Authority).

For purposes of this analysis, we do not consider those authorities without statutory authorization to issue bonds, although virtually all of those are also designated as political subdivisions and/or as public bodies corporate

13

that a community development authority is one of only a few

authorities for which such a designation is noticeably

absent from the enabling legislation.[11]  Also significant is

the fact that the General Assembly provided a method in

Code § 15.2-5126 to challenge bonds issued by a community

_____

and politic.  See, e.g., Code § 15.2-5501 (Tourism Development Authority is a "political subdivision, a body politic and corporate"); Code § 15.2-6000 (Virginia Coalfield Economic Development Authority created as a "body politic and corporate, a political subdivision"); Code § 15.2-6100 (Southside Virginia Development Authority created as a "body politic and corporate, a political subdivision"); Code § 33.1-426 (Virginia Coalfield Coalition Authority created as a "body corporate and as a political subdivision"); Code §§ 37.1-242 to -243 (Behavioral Health Authorities are "public instrumentalit[ies]," "public bod[ies]" and "bod[ies] corporate and politic"); Code § 51.5-54(B) (Assistive Technology Loan Fund Authority created as a "public body corporate and as a political subdivision"); and the following authorities established by the General Assembly in statutory provisions effective October 1, 2001 and explicitly created as "political subdivision[s]":  Code § 2.2-2234(C) (Virginia Economic Development Partnership Authority); Code § 2.2-2248 (Virginia Information Providers Network Authority); Code § 2.2-2315(C) (Virginia Tourism Authority).

[11] In addition to community development authorities, other authorities not denominated as a "political subdivision" or as a "body politic and corporate" include jail authorities, Code §§ 53.1-95.2 through -95.24, and, effective July 1, 2002, the Northern Virginia Transportation Authority, Code §§ 15.2-4816 through -4828. However, the enabling legislation for jail authorities provides that each such authority "shall be deemed to be an instrumentality exercising public and essential governmental functions . . . ."  Code § 53.1-95.7. Similarly, Code § 15.2-4817 states that the Northern Virginia Transportation Authority "shall function as a public instrumentality."

14

development authority, but that it did not do so in the enabling legislation for all those authorities previously listed, supra note 11, except the Virginia Resources Authority.[12]

However, the Public Entities argue that the mere fact that a community development authority is not classified by the General Assembly as a "political subdivision" is not determinative. Relying on County of York v. Peninsula Airport Commission, 235 Va. 477, 369 S.E.2d 665 (1988), they contend that the pertinent question is whether a community development authority enjoys the essential attributes of a political subdivision. Using that analysis, the Public Entities assert that the CDA is a political subdivision because it possesses all the necessary powers, with the exception of the power of eminent domain.

We are not persuaded by this argument and believe that Peninsula Airport and other similar cases are distinguishable. The issue in Peninsula Airport was whether the Peninsula Airport Commission was a political subdivision within the meaning of Article X, § 6(a) of the

---

[12] The Virginia Resources Authority does not actually have a separate method for determining the validity of its bonds. Instead, Code § 62.1-208 provides that the Authority may bring an action under the Public Finance Act.

15

Constitution of Virginia and former Code § 58-12(1), and thus exempt from taxation by York County. Id. at 478-79, 369 S.E.2d at 665. Noting that the trial court had used the terms "municipal corporation" and "political subdivision" interchangeably and without objection by counsel, we reiterated that "municipal corporations are 'political subdivisions of the State.'" Id. at 480, 369 S.E.2d at 666 (quoting Richmond, Fredericksburg & Potomac R.R. Co. v. City of Richmond, 145 Va. 225, 238, 133 S.E. 800, 803-04 (1926)). However, since the converse is not necessarily true, the Court then considered whether the Commission was a municipal corporation. In doing so, we listed the six attributes of a municipal corporation as previously enumerated in City of Richmond v. Richmond Metropolitan Authority, 210 Va. 645, 647, 172 S.E.2d 831, 832 (1970)(citing Hampton Rds. Sanitation Dist. Comm'n v. Smith, 193 Va. 371, 376, 68 S.E.2d 497, 500 (1952)). One of those attributes is "[c]reation as a body corporate and politic and as a political subdivision of the Commonwealth." Id.

Focusing on that attribute, York County argued that the Peninsula Airport Commission could not occupy the status of a municipal corporation because the legislative act creating the Commission did not expressly classify it

16

as a political subdivision.  Peninsula Airport, 235 Va. at 481, 369 S.E.2d at 667.  We rejected that argument because "[t]he original act provided that [the Commission] was to be an 'independent body corporate[,]' " and the "enabling act, as amended, provided that 'neither the Commonwealth nor any political subdivision thereof other than the [C]ommission shall be liable' " on any bonds issued by the Commission.  Id. (quoting Acts 1946, c. 22, § 8 and as amended, § 15) (emphasis deleted).  We then concluded that the Peninsula Airport Commission possessed the essential attributes of a municipal corporation.  Id.

This detailed examination of our decision in Peninsula Airport demonstrates two analytical points.  First, in determining whether that Commission was a political subdivision, the Court looked solely at the statutory language used in the Commission's enabling legislation, not at the Commission's attributes, an approach advanced by the Public Entities.  Second, the essential attributes, one of which was the fact that the Commission was created as a political subdivision, were relevant only to the inquiry whether the Commission was also a municipal corporation. This same analytical framework is evident in other cases. See, e.g., Carter v. Chesterfield Co. Health Comm'n, 259 Va. 588, 590, 527 S.E.2d 783, 784 (2000) (stating that

17

Chesterfield County Health Commission is a political subdivision[13] and that such entities may be entitled to the status of a municipal corporation for purposes of immunity from tort liability; parties generally agreed that Commission was entitled to such status); Virginia Elec. & Power Co. v. Hampton Redev. & Housing Auth., 217 Va. 30, 32-33, 225 S.E.2d 364, 367 (1976) (housing authority designated by statute as a political subdivision, one of the attributes of a municipal corporation); Richmond Metro. Auth., 210 Va. at 647-48, 172 S.E.2d at 832-33 (noting that Richmond Metropolitan Authority was created by statute as a "political subdivision and public body corporate and politic of the Commonwealth" and concluding that the Authority possessed attributes of a municipal corporation); Hampton Rds. Sanitation Dist., 193 Va. at 376-77, 68 S.E.2d at 500 (by statute, the Hampton Roads Sanitation District Commission was created as a body corporate and politic and each commission "shall constitute a political subdivision of the Commonwealth"; that attribute, along with other powers, made the Commission a municipal corporation).

---

[13] Code § 15.2-5200 states that "a hospital or health center commission shall be created as a public body corporate . . . ."

Thus, we conclude that we must confine our analysis of whether the CDA is a political subdivision to the language of the relevant enabling legislation.  Based on the analytical framework in our prior cases, that inquiry does not include consideration of the CDA's attributes or whether it is similar to other authorities that are designated by the General Assembly as "political subdivisions."  We also are persuaded by the fact that the General Assembly clearly knows how to denominate an authority as a "political subdivision" when it wishes to do so.  See supra note 11.  Thus, in the absence of any statutory designation of community development authorities as "political subdivisions," we conclude that the CDA is not such an entity.[14]

The Public Entities have not asserted that the CDA is a locality, or an agency or instrumentality of the Commonwealth.  We also conclude that the CDA is not one of

---

[14] We recognize that, in the resolution creating the CDA, the Board designated it as a "body corporate and politic."  However, in light of the enabling legislation for community development authorities, we believe that the Board did not have any statutory power to do so.  "In Virginia the powers of boards of supervisors are fixed by statute and are limited to those conferred expressly or by necessary implication."  Bd. of Supervisors v. Horne, 216 Va. 113, 117, 215 S.E.2d 453, 455 (1975) (citing Gordon v. Bd. of Supervisors, 207 Va. 827, 832, 153 S.E.2d 270, 274 (1967); Johnson v. Goochland County, 206 Va. 235, 237, 142 S.E.2d 501, 502 (1965)).

19

those other entities.  Cf. Virginia Elec. & Power Co., 217 Va. at 32-33, 225 S.E.2d at 367 (although housing authority denominated a political subdivision of the Commonwealth, such authority comes into existence only by local action and is thus purely local in nature and not a state agency).  Since Article 6 of the Public Finance Act applies only to proceedings to validate bonds of "any locality or other political subdivision, agency or instrumentality of the Commonwealth," Code § 15.2-2650, and since the General Assembly did not classify community development authorities as one of those entities, the CDA cannot utilize the procedure set forth in Code § 15.2-2651 to validate its bonds.

We are, nonetheless, mindful of the broad language contained in the Public Finance Act.  Specifically, Code § 15.2-2650 states that the provisions of Article 6 of that act "apply to all suits, actions and proceedings of whatever nature involving the validity of bonds of any locality or other political subdivision, agency or instrumentality of the Commonwealth," (emphasis added), and pursuant to Code § 15.2-2651, such entities "may bring at any time a proceeding in any court . . . to establish the validity of the bonds."  Code § 15.2-2650 also states that "[t]hese provisions supersede all other acts and statutes

20

on the subject and are controlling in all cases, notwithstanding the provisions of any other law or charter to the contrary." Despite these all-embracing statements, the fact remains that the plain terms of Code §§ 15.2-2650 and -2651 allow only a "locality or other political subdivision, agency or instrumentality of the Commonwealth" to bring a bond validation proceeding under Article 6 of the Public Finance Act.

Furthermore, the WWAA contains equally broad language. Code § 15.2-5100 provides that the WWAA "shall constitute full and complete authority, without regard to the provisions of any other law for the doing of the acts herein authorized, and shall be liberally construed to effect the purposes of the [WWAA]." Similarly, Code § 15.2-5129 states that "[b]onds may be issued under the provisions of [the WWAA] without obtaining the approval or consent of any department, division, commission, board, bureau or agency of the Commonwealth, and without any other proceeding or the happening of any other condition or thing than those proceedings, conditions or things which are specifically required by [the WWAA]."

We also note that Code § 15.2-2627 of the Public Finance Act is similar to Code § 15.2-5126 in the WWAA. Both sections provide that "any person in interest" may

21

contest the validity of bonds for a period of 30 days after the date when the ordinance or resolution authorizing the bond issuance is filed in the circuit court.  However, while the Public Finance Act contains two discrete provisions through which the validity of certain bonds may be either challenged, see Code § 15.2-2627, or established, see Code § 15.2-2651, the WWAA provides only the method of challenging the validity of bonds issued by a community development authority, see Code § 15.2-5126, and that provision does not permit the community development authority itself to initiate a bond validation proceeding such as the present one.  A person in interest may contest, but not seek to establish, the validity of such bonds. Code § 15.2-5126.  However, the fact that only one method is available to determine the validity of bonds issued by a community development authority does not change our analysis.  Such matters are within the province of the General Assembly to decide.

Moreover, as we emphasized earlier, the inclusion of Code § 15.2-5126 in the WWAA is singular among the Code's various provisions establishing other authorities.  Our search of the Code revealed virtually no other authority for which a separate procedure to determine the validity of a bond issuance is included within the legislation

22

expressly pertaining to that authority.  Thus, the General Assembly obviously realizes when it needs to include such a procedure because a particular authority, in this case the CDA, cannot utilize Article 6 of the Public Finance Act to validate its bonds.

This last observation is in accord with our decision in Mayor of Lexington v. Industrial Development Authority, 221 Va. 865, 275 S.E.2d 888 (1981).  There, the appellant challenged the right of an industrial development authority to proceed under the Public Finance Act in effect at that time.  In rejecting the appellant's argument, we concluded that "[w]hen the General Assembly made industrial development authorities political subdivisions of the Commonwealth, it thereby brought them within the purview of Code § 15.1-214," (the predecessor to Code § 15.2-2651). Id. at 871, 275 S.E.2d at 891.  We believed it was apparent that the General Assembly did not provide a separate procedure for challenging or validating industrial development bonds in the Industrial Development and Revenue Bond Act itself because the language of former Code § 15.1-214 clearly applied to all political subdivisions, and thus to industrial development authorities.  Id.  Based on the rationale in Mayor, it follows that, in the present case, the General Assembly included a procedure in the WWAA to

23

challenge bonds issued by a community development authority since that authority, not being a "locality or other political subdivision, agency or instrumentality of the Commonwealth," Code § 15.2-2650, does not come within the purview of the Public Finance Act.

CONCLUSION

For the reasons stated, we conclude that the circuit court erred in allowing this action to proceed under the Public Finance Act. This Court is fully aware of the fact that its decision today leaves unresolved the question whether the proposed bond issuance is valid. We are also cognizant of the significant financial and economic interests at stake. However, we cannot ignore the plain terms of the Public Finance Act and the enabling legislation for community development authorities simply to accommodate those interests or to conserve judicial resources. Accordingly, we will vacate the circuit court's decision invalidating the proposed bond issuance and dismiss this action.[15]

Vacated and dismissed.

---

[15] In light of our decision, we do not address the remaining assignments of error and cross-error.