COURT OF APPEALS OF VIRGINIA

Present:  Judges Huff, O'Brien and AtLee
Argued at Norfolk, Virginia

UNPUBLISHED

ANGELA M. GREENE

v.        Record No. 1461-22-1

CITY OF PORTSMOUTH, ET AL.

MEMORANDUM OPINION[*] BY
JUDGE GLEN A. HUFF
MARCH 19, 2024

FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
Pamela S. Baskervill, Judge Designate

Thomas K. Plofchan, Jr. (Jacqueline A. Kramer; Westlake Legal
Group, PLLC, on briefs), for appellant.

Melissa Y. York (Harman, Claytor, Corrigan & Wellman, on
brief), for appellee Lydia Pettis Patton.[1]

(James A. Cales III; Furniss, Davis, Rashkind and Saunders, P.C.,
on brief), for appellee City of Portsmouth.

(Elliott O. Moody; Eric O. Moody & Associates, on brief), for
appellee LaVoris Pace.

(Verbena M. Askew; The Verbena Askew Law Firm, P.C., on
brief), for appellee L. Louise Lucas.  Appellee L. Louise Lucas
submitting on brief.

(Shepherd D. Wainger; Alexandra M. Gabriel; Kaleo Legal, on
brief), for appellee Lisa Lucas-Burke.

(S.W. Dawson; Dawson, P.L.C., on brief), for appellee Milton Roy
Blount.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Ms. York presented oral argument on behalf of all appellees, except for Lucas who had
previously waived oral argument in her brief.

In April 2021, Angela M. Greene ("appellant") filed suit in the Circuit Court for the City of Portsmouth (the "circuit court") against several individuals and the City of Portsmouth (the "City") on allegations of wrongful termination, tortious interference, gross negligence, and defamation. Appellant challenges the circuit court's final orders, entered in August 2022, dismissing all claims with prejudice. For the following reasons, this Court affirms in part, reverses in part, and remands the case for further proceedings in accordance with this opinion.

ALLEGATIONS[2]

This litigation arises from events occurring June 9, 2020, and the days immediately following. At that time, appellant served as the chief of police for the City of Portsmouth; she was an at-will employee and reported to the city manager. Lydia Patton served as Portsmouth's city manager until her resignation on September 8, 2020, at which point LaVoris Pace became interim city manager. Lisa Lucas-Burke was a member of the city council and vice-mayor of Portsmouth. Her mother, L. Louise Lucas, was president pro tempore of the Senate of Virginia and a deaconess of New Mount Olivet Baptist Church. Milton Blount was Mt. Olivet's senior pastor and the president of the Martin Luther King, Jr. Leadership Steering Committee.

Events of June 9-11, 2020: "The Monument Incident"

Late on the evening of June 9, 2020, a group of individuals gathered at the site of a Confederate monument located in the City of Portsmouth. The monument was comprised of a stone obelisk surrounded by four statues at its base. It sat in the middle of a street and was

---

[2] On appeal from a sustained demurrer, this Court "accept[s] as true all factual allegations expressly pleaded in the complaint and interpret[s] those allegations in the light most favorable to the plaintiff." *Coward v. Wellmont Health System*, 295 Va. 351, 358 (2018); *see also Wright v. Graves*, 78 Va. App. 777, 784 (2023). Because special pleas of sovereign immunity are treated like other types of pleas in bar, "the facts stated in the plaintiff's [complaint] are deemed true" on appellate review where, as here, the lower court took no evidence in support of the plea. *Massenburg v. City of Petersburg*, 298 Va. 212, 216 (2019) (alteration in original) (quoting *Lostrangio v. Laingford*, 261 Va. 495, 497 (2001)).

surrounded by a fence. The individuals who gathered around the monument intended to deface it, and one member of the group told a police officer on scene that members of the city council had told them "they could deface the monument."

Upon learning of this statement, appellant attempted to contact Patton to determine whether any authorized person or valid authority had given permission for the monument to be defaced, damaged, or destroyed. Patton did not return appellant's calls. Appellant then contacted the city attorney and asked him whether the city council or authorized person "gave permission" for individuals to deface, damage, or destroy the monument. The city attorney told appellant that no such permission had been given. Appellant then spoke with police officers at the scene and told them not to allow any damage, destruction, or defacement to occur.

The individuals gathered at the monument later hung signs on the fence surrounding the obelisk and used washable chalk to write messages in the area. They also placed a trash bag and/or a sheet around the face of one of the monument's statues. Police told the protestors that they would be arrested for destruction of property if the monument was defaced or damaged.

Early on the morning of June 10, Patton called appellant and requested an update on the situation. She told appellant that the city would not allow the monument's statues to be covered every night and that the city council would discuss the matter promptly.

Between 8:30 and 10:30 a.m. that morning, appellant spoke several times with two individuals who had remained at the monument. Appellant told them that if they did not leave, they would be arrested for trespassing. Around 11:30 a.m., police gave the two individuals a fourth and final warning to leave the area. When the individuals refused to leave or to sign a summons, they were arrested. At about the same time, appellant informed Patton and the city attorney that she had received new information that another group of protestors planned to gather at the monument that evening and that members of the groups planned to deface or otherwise

damage the monument with paint and sheets. Shortly thereafter, around 12:00 p.m., appellant updated Patton that no trespassing signs had been posted around the monument. With Patton's approval, barricades were also placed around the monument and the entry to its enclosure was locked.

At approximately 2:00 p.m. that afternoon, police officers on scene told appellant that Lucas had approached the monument and stated that Patton and the mayor would allow damage to the monument and that the police were not to make any arrests. Appellant called Patton to confirm Lucas' statements, and Patton informed appellant that she had not told Lucas that individuals could damage, deface, destroy, or cover the monument. Appellant then went to the monument, where she saw Lucas addressing a crowd and heard her say, "to hell with City Council, they had three years."

As members of the crowd shook cans of spray paint, Lucas repeatedly told them to "go cover it"; the crowd began converging on the monument while repeating, "cover it." Lucas also told the crowd that they would not be stopped because she had spoken with the city manager and would ensure that no one was arrested. Lucas then told police she had "just talked to . . . Patton" and that the crowd was "gonna put some paint on this thing and y'all can't arrest them. I'm Senator Louise Lucas, I know I'm in disguise, but they are going to put some paint on this thing." She also told officers, "[y]ou cannot arrest them. You need to call . . . Patton, because they are going to do it. You can't stop them. This is City property."

As appellant spoke with some of the individuals gathered around the monument and told them that they still were not permitted to be on the site, Lucas approached appellant and told her, "they are now. . . . Patton just gave permission through me. You need to give her a call. I talked to her 15 minutes ago." Appellant replied that she would call Patton, but that she had "just talked to [Patton] less than 5 minutes ago and no one is allowed on the property." As members

of the crowd began spray-painting the monument, appellant called Patton at two different phone numbers, but Patton did not answer the calls. Appellant then called the city attorney, who advised her to focus police efforts on the preservation of life rather than property.

Shortly after 3:30 p.m., appellant sent messages to Patton and the city attorney informing them that the crowd around the monument was nonviolent at that time. She also communicated that her objective was the preservation of life, given she had received no other directives from Patton. More than an hour later, Patton responded to appellant and told her to "keep everyone safe."

The city council held an emergency meeting that evening at about 5:00 p.m. Appellant was not advised or informed that there should be any change to police tactics at the monument. By 8:00 p.m., the size of the crowd around the monument had increased to more than 200 people. The city's leadership made no change to its position that the monument was city property and should be protected, although with an emphasis on the preservation of life.

Around 8:43 p.m., individuals in the crowd began breaking off pieces of the monument, and Patton advised appellant to stop them. Appellant called the city attorney to discuss the matter before instructing officers to create a two-block perimeter around the monument. She also attempted to contact organizers of the crowd to seek their assistance in stopping the crowd from breaking off pieces of the monument because that conduct might lead to injuries. The organizers declined to speak with appellant.

Not long after, appellant learned that a person had suffered a life-threatening injury from getting struck by a piece of the monument that had been broken or pried loose. Appellant immediately initiated efforts to disperse the crowd; she even obtained assistance from the crowd's organizers, who acquiesced to her request and began instructing people to depart.

Once the area around the monument was clear, appellant called in a police forensic and homicide unit to investigate the life-threatening injury. Due to the complicated political situation surrounding the events at the monument, appellant later requested the Virginia State Police ("VSP") to initiate a full investigation of the events. Ultimately, the VSP investigated only the injury and denied appellant's request for a broader investigation.

Around 2:15 a.m. on June 11, while appellant was still at the monument, local television media asked her who had given the order for police to "stand down." Appellant replied that she had not ordered police to ignore the destruction of property, but that "an elected official" had directed officers to allow the crowd to vandalize the monument.

Attempts to Investigate the Events of June 9-11, 2020

On June 11, 2020, Lucas told local media that appellant had "abdicated her responsibility to maintain peace and failed to uphold the law" during the incidents at the monument. Lucas also stated that Patton should fire appellant "immediately." That same day, Patton and the city attorney chastised appellant for her comment to local media about an elected official saying that officers could not make arrests. Although appellant reported only to the city manager, it was the city attorney who informed appellant that she would be fired if she spoke about elected officials again.

The city attorney also directed appellant to contact the VSP and advise them that city officials had requested a complete investigation of events. Despite appellant's desire for the VSP to investigate, a VSP Lieutenant Colonel told appellant he did not believe anything had occurred during the events at the monument that constituted an "abuse of power," which was the threshold requirement for the VSP to conduct a full investigation. Nevertheless, that official told appellant he would relay her request to his superiors. After appellant informed them about the VSP's response, Patton and the city attorney became concerned about VSP's reference to the

term "abuse of power."  Patton told appellant to contact the VSP again and inform them that the city no longer wanted a complete investigation.  Appellant complied.

Sometime during the week of June 13, appellant and Patton spoke by telephone. Appellant informed Patton that she was forming a team of detectives to investigate the monument incident and determine whether criminal charges were justified for acts committed in appellant's presence or in the presence of other officers.  Patton told her that the matter was closed and ordered that neither she nor her department conduct such an investigation by any means.  Patton also stated that the city attorney had discussed the matter with the city council and that the council agreed that the investigation would be a "conflict of interest."  Patton never elaborated on the specific nature of the supposed "conflict."

Patton then instructed the city attorney to call appellant.  The city attorney told appellant that the members of city council were his clients and he had advised them that, once an investigation into the monument incident commenced, he could not guarantee the investigation would not implicate some of the council members.  The city attorney then told appellant that no investigation into the incidents at the monument should occur.  The Commonwealth's Attorney for Portsmouth also announced that she would not request a special grand jury to investigate the incidents at the monument.

Appellant, whose duties as chief of police required her to "ensure[] that laws and ordinances are enforced," met with police detectives on July 22 to discuss the June incidents at the monument.  She directed the detectives to investigate the incidents and advise her of any applicable criminal charges.  She also asked them to research how other jurisdictions and localities charged people for the destruction of monuments.

On August 6, appellant's investigators told her they had determined there would be no conflict of interest if the police department conducted the investigation.  Six days later, the

investigators provided appellant with a probable cause summary relating to the monument incident along with a list of felony charges and persons to be charged. They also informed her that the Commonwealth's Attorney for the city was a potential witness to the incidents and would therefore be excluded from reviewing the cases for presentation to a magistrate.

On August 17, appellant spoke to Patton and the city attorney about her decision to seek felony property crime charges against certain persons. She stated that, based on her team's research of the issue, there was no conflict of interest in her investigation and that she planned to present several cases to a magistrate. Appellant also told Patton that it was her sworn duty to investigate and that, under relevant statutory law, it was her prerogative to seek a magistrate's review of the cases. Neither Patton nor the city attorney wished to discuss the matter with appellant, telling her that the matter was "closed." They also repeatedly insisted there was a "conflict," although they did not explain the nature of the putative conflict. When appellant reiterated that it was her duty to seek a magistrate's review of possible felony charges, Patton responded that she did not want to hear it and ordered appellant to stop seeking magistrate review of warrants. Referencing Virginia law and her sworn oath, appellant stated that she could not comply. Patton then yelled that appellant needed to control her officers and abruptly ended the phone call with appellant.

Later that day, appellant's investigating officers presented a magistrate with fourteen applications for felony warrants for destruction of property. Upon review, the magistrate found probable cause to bring the charges and issued the fourteen warrants. One of the individuals arrested was Lucas.

Appellant's Termination Following the Filing of Charges

After the felony warrants were issued on August 17, Lucas-Burke spoke to the media and city council, demanding appellant be fired for her "disrespectful act of insubordination." Using

her city email account, and identifying herself as the vice-mayor, Lucas-Burke also emailed city officials calling for appellant's termination despite the existence of a city ordinance prohibiting the council and its members from requesting the removal of city employees appointed by the city manager. Lucas-Burke publicly disseminated her email by posting it on her social media account (Facebook) and providing it to news media.

Two days later, during a press conference specifically scheduled to call for appellant's termination, Lucas-Burke advocated for appellant to be fired and criticized the conduct of the police. When a reporter questioned Lucas-Burke's power to compel appellant's termination, Lucas-Burke replied that if Patton didn't do so then firing appellant would be "the first order of business that I want the new city manager to take on." Blount also appeared at the press conference and implied that, under appellant's leadership, the police had impugned Lucas's character and made her "look like [she] committed a crime." He then advocated for Patton to request appellant's immediate resignation and called on the VSP to "conduct investigations" into the city police.

On September 4, the city's director of human resources met with appellant to inform her that Patton had placed her on administrative leave. According to the letter signed by Patton, appellant was to remain "on administrative leave with pay" while the city investigated "concerns" that her recent "decision making, actions and behavior . . . may implicate either serious policy violations and/or critical lapses in judgment, and omissions in communications." Patton noted that the City's concerns called into question appellant's "ability to meet [Patton's] legitimate expectations for optimum performance of [appellant's] job as Chief of the Portsmouth Police Division."

Four days later, on September 8, Patton resigned as city manager. Her successor, Pace, met with appellant two days later to tell her that he was not investigating her and that he was

unaware of any investigation into her conduct. He further stated that if an investigation began, he would advise appellant of its nature.

On September 22, the Martin Luther King, Jr. Steering Committee ("MLK Committee"), a political action committee affiliated with Lucas, sent a public letter to city council calling for appellant to be fired. The letter was signed exclusively by Blount, who was the committee's president and a pastor at the church where Lucas served as a deaconess. In the letter, Blount alleged that appellant had "ignored a conflict of interest"; disregarded "the advice of legal counsel and the law and decided to have her department police themselves"; "displayed a dereliction of duty" during the monument's destruction, thereby thrusting the city "into an embarrassing light across the nation and the globe"; "falsified information" about VSP investigations; and "withheld critical information" from city authorities "[i]n an attempt . . . to cover up her neglect and dereliction of duty," which "left the city in a vulnerable and embarrassing position." The letter concluded by stating that "[t]hese issues can only be resolved by terminating [appellant]."

During an interview with local news media on September 23, Pace stated that appellant was under investigation. He also told the media that there were pending investigations by the VSP and FBI. Pace subsequently sent appellant a letter stating that there would be an investigation into her recent conduct and that she was to remain on administrative leave.

Upon motion by the Commonwealth, the criminal charges against Lucas were dismissed on November 16, 2020. Lucas then made a statement to local news media alleging that the charges against her had been "racist." She also stated that the police involved had made "a mockery of the justice system" by bringing "bogus" charges. She further remarked that dismissal of the charges against her would "give[] people . . . hope that when they come to these

courtrooms that they will be treated in a fair and just manner, even though you may have a rogue police department who intends to criminalize the justice system against people like me."

That same day, November 16, Pace terminated appellant's employment following "a review of [her] performance, decision making, and policy compliance in the last few months." After reminding appellant that she was an at-will city employee, Pace "concluded that it [wa]s in the best interest of the City and, in particular, the best interest of the City's Police Department, that [appellant's] employment as Chief of Police be terminated."

Appellant's Complaint and the Circuit Court's Rulings

On April 9, 2021, appellant filed a complaint against the City, Patton, Pace, Lucas-Burke, Lucas, and Blount. In Count I, she alleged that the City, Patton, and Pace had wrongfully terminated her in retaliation for her refusal to obey "unlawful directives . . . not to investigate the monument incident." Count II, against those same parties, alleged wrongful termination in retaliation for appellant's compliance with the law when she followed her "sworn duty" to "prosecute offenses against the Commonwealth" and "investigate and present warrants to a magistrate."

Count III alleged that Blount, Lucas, and Lucas-Burke had tortiously interfered with appellant's contract and/or business expectancy with the City when they "manufactured falsehoods" about her, asserted those falsehoods as facts, and used those falsehoods to bring political pressure for appellant's termination. In Count IV, appellant alleged that Patton and Lucas-Burke were grossly negligent in taking actions that interfered with appellant's right to be free from unlawful termination, including Lucas-Burke's "violation of Portsmouth City Code" when she called for appellant's termination. Finally, in Counts V, VI, and VII, respectively, appellant raised individual claims of defamation against Blount, Lucas, and Lucas-Burke.

- 11 -

In response, the City filed a demurrer and special plea arguing that the complaint failed to state a claim for which relief could be granted and that the City enjoyed sovereign immunity from suit. Patton and Pace likewise filed demurrers and special pleas of sovereign immunity. Blount, Lucas, and Lucas-Burke also filed demurrers for the claims against them. The parties appeared for a hearing on appellees' demurrers and special pleas on March 3, 2022.[3]

After hearing argument from the City, Patton, Pace, and appellant, the circuit court ruled on the demurrers and special pleas related to Counts I and II alleging wrongful termination. Without making any factual findings, the court held that it "agree[d] with the position of the defendants" and would "sustain the pleas of sovereign immunity." Noting that its ruling "could be dispositive for the completeness of the [c]ourt's consideration for purposes of appellate review," the court also ruled that it would sustain the demurrers for those three appellees. The court then dismissed Counts I and II with prejudice and denied appellant leave to amend those claims.

Next, the circuit court sustained the demurrers of Blount, Lucas, and Lucas-Burke with respect to Count III and denied appellant's request for leave to amend that count. The court noted that it had "read this complaint on more than one occasion" and that Count III's allegations were "conclusory" and "[t]here was no relationship with the [c]ity . . . so I'm sustaining the demurrer as to the three defendants. I'm dismissing count 3 with prejudice."

As to Count IV, the circuit court sustained Patton and Lucas-Burke's demurrers, noting only that it "agree[d] with the arguments of defense counsel." It also denied appellant's request for leave to amend. Finally, the circuit court sustained the demurrers that Blount, Lucas, and

---

[3] The matter was heard by a retired judge sitting by designation after the judges of the Third Judicial Circuit, which includes the City of Portsmouth, recused themselves.

Lucas-Burke had filed with respect to Counts V, VI, and VII. Because it granted appellant leave to amend those claims, the circuit court dismissed the three defamation counts *without* prejudice.

The circuit court subsequently entered an order on August 24, 2020, memorializing its rulings from the March 3 hearing. The order explicitly sustained the City's and Pace's demurrers and special pleas, dismissing all claims against them with prejudice and without leave to amend.[4] Despite the court's ruling from the bench during the March 3 hearing, the August 24 order sustained Patton's demurrer but failed to mention her plea of sovereign immunity. Notwithstanding that omission, the order then dismissed "all counts against . . . Patton, with prejudice and without leave to amend." The court further sustained the demurrers brought by Blount, Lucas, and Lucas-Burke, and dismissed the claims against them with prejudice, except for the three defamation claims which were dismissed without prejudice based on the court's grant of leave for appellant to amend.

Appellant's amended complaint was filed on June 1, 2022, and contained amended claims of defamation against Blount, Lucas, and Lucas-Burke. For purposes of appeal, appellant also restated Counts I through IV in the amended complaint. Blount, Lucas, and Lucas-Burke filed renewed demurrers seeking dismissal of the amended defamation counts. Without conducting another hearing, the circuit court issued a series of orders on August 25, 2022, sustaining appellees' demurrers and dismissing all three defamation counts with prejudice. This appeal followed.

ANALYSIS

Appellant raises nine assignments of error challenging the circuit court's dismissal of her case. The first four allege that the circuit court erred in sustaining both the special pleas of sovereign immunity and the demurrers filed by the City, Patton, and Pace regarding Counts I and

---

[4] The circuit court did not, however, explain its decision in any written document.

- 13 -

II in the initial complaint for wrongful termination. Next, appellant argues in assignments of error five and six that the circuit court erred in sustaining the demurrers filed against her claims of tortious interference (Count III) and gross negligence (Count IV) in the initial complaint. The final three assignments of error assert that the circuit court erroneously sustained the "renewed demurrer[s]" filed by Blount, Lucas, and Lucas-Burke regarding their individual defamation counts (V, VI, and VII) in the amended complaint.[5] Appellant asks this Court to remand all of the claims made against each appellee.

In considering appellant's claims on appeal, this Court is bound by the applicable standard of review, under which this Court renders no determination on the merits of the case.[6] Although the circuit court did not state the basis for its decision, this Court nevertheless concludes, for the following reasons, that the circuit court did not err in dismissing appellant's claims against the City, Patton, Pace, Lucas, and Lucas-Burke for failure to state a claim.

Standard of Review

This Court reviews de novo a circuit court's decision to sustain or overrule a demurrer as well as its ruling on a plea of sovereign immunity. *Givago Growth, LLC v. iTech AG, LLC*, 300

---

[5] Although appellant preserved a challenge to the circuit court's dismissal without prejudice of the defamation counts in the initial complaint, she has not raised that claim on appeal. Accordingly, in determining whether the circuit court erred in dismissing the amended defamation counts, this Court will only consider the sufficiency of the pleadings alleged in the amended complaint.

[6] "A demurrer tests the legal sufficiency of the facts alleged in a complaint assuming that all facts alleged therein and all inferences fairly drawn from those facts are true." *Givago Growth, LLC v. iTech AG, LLC*, 300 Va. 260, 264 (2021). Thus, appellant "need show only that the court erred, not that . . . [she] would have prevailed on the merits of the case." *Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 713 (2006); *see also Francis v. Nat'l Accrediting Comm'n of Career Arts & Sciences, Inc.*, 293 Va. 167, 171 (2017) ("The trial court is not permitted on demurrer to evaluate and decide the merits of the allegations set forth in a [complaint], but may only determine whether the factual allegations of the [complaint] are sufficient to state a cause of action." (alteration in original) (quoting *Harris v. Kreutzer*, 271 Va. 188, 195 (2006))).

- 14 -

Va. 260, 264 (2021); *Pike v. Hagaman*, 292 Va. 209, 214 (2016). Both matters raise a pure question of law. *Butler v. Stegmaier*, 77 Va. App. 115, 125 (2023); *Commonwealth v. Muwahhid*, 77 Va. App. 821, 828 (2023).

"The purpose of a demurrer is to determine whether a complaint states a cause of action upon which the requested relief may be granted." *Assurance Data, Inc. v. Malyevac*, 286 Va. 137, 143 (2013).[7] Because a demurrer "'tests the legal sufficiency of facts alleged in pleadings, not the strength of proof[,]' . . . 'we consider as true all material facts alleged in the . . . complaint, all facts impliedly alleged, and all reasonable inferences that may be drawn from such facts.'" *Id.* (first quoting *Dunn, McCormack & MacPherson v. Connolly*, 281 Va. 553, 557-58 (2011); and then quoting *Concerned Taxpayers v. Cnty. of Brunswick*, 249 Va. 320, 323 (1995)).[8] Regarding special pleas of sovereign immunity, this Court similarly accepts as true "[t]he facts as stated in the pleadings by the plaintiff . . . ." *Muwahhid*, 77 Va. App. at 828 (first alteration in original) (quoting *Niese v. City of Alexandria*, 264 Va. 230, 233 (2002)). In reviewing the alleged facts, this Court gives no weight to unreasonable inferences—those that are "strained, forced or contrary to reason"—and "do[es] not accept the veracity of conclusions of law camouflaged as factual allegations or inferences." *Coward v. Wellmont Health System*,

---

[7] "[U]nlike a motion for summary judgment, a demurrer 'does not allow the court to evaluate and decide the merits of a claim.'" *Malyevac*, 286 Va. at 143 (quoting *Fun v. Va. Mil. Inst.*, 245 Va. 249, 252 (1993)).

[8] "In ruling on the demurrers, this Court considers not only the pleadings, but also the documents attached thereto." *Mansfield v. Bernabei*, 284 Va. 116, 121 (2012). By doing so, "we accept as true all allegations of historical fact pleaded . . . and interpret them in the light most favorable to the plaintiff. We review the circuit court's legal conclusions de novo." *Viers v. Baker*, 298 Va. 553, 558 (2020). "In addition to accepting all sufficiently definite factual allegations in the complaint as true, we 'accept as true unstated inferences' in the complaint 'to the extent that they are *reasonable*,' but 'give them no weight to the extent that they are *unreasonable*.'" *Parrish v. Callahan*, 78 Va. App. 630, 638 (2023) (quoting *Patterson v. City of Danville*, 301 Va. 181, 197 (2022)). Nevertheless, "[a] court considering a demurrer may ignore a party's factual allegations contradicted by the terms of authentic, unambiguous documents that properly are part of the pleadings." *Schaecher v. Bouffault*, 290 Va. 83, 107 (2015).

295 Va. 351, 358 (2018) (first quoting *Cnty. of Chesterfield v. Windy Hill Ltd.*, 263 Va. 197, 200 (2002); and then quoting *AGCS Marine Ins. v. Arlington Cnty.*, 293 Va. 469, 473 (2017)).

Accordingly, to survive a demurrer, the complaint must adequately state a cause of action by "alleg[ing] sufficient facts to constitute a foundation in law for the judgment sought and not merely conclusions of law." *Hubbard v. Dresser, Inc.*, 271 Va. 117, 122 (2006); *see also Patterson v. City of Danville*, 301 Va. 181, 197 (2022) (holding that the factual allegations in the complaint must be "made with sufficient definiteness to enable the court to find the existence of a legal basis for its judgment" (internal quotation marks omitted) (quoting *Squire v. Va. Hous. Dev. Auth.*, 287 Va. 507, 514 (2014))).[9]  On the other hand, "[a] special plea of sovereign immunity, if proven, creates a bar to a plaintiff's claim of recovery" against all immunized defendants. *City of Chesapeake v. Cunningham*, 268 Va. 624, 633 (2004).[10]

Procedural Issues

Before assessing the propriety of the circuit court's judgment, this Court must address the following miscellaneous procedural issues raised by appellees or apparent on the record.

*Errors in Final Order*

On March 3, 2022, the circuit court conducted a hearing on the appellees' demurrers as well as the special pleas of sovereign immunity filed by the City, Patton, and Pace.  At the conclusion of the parties' arguments, the circuit court stated its rulings from the bench.  The

---

[9] *See also Francis*, 293 Va. at 171, and *Qiu v. Huang*, 77 Va. App. 304, 317 (2023), both finding a demurrer properly sustained where the challenged pleading did not allege sufficient facts stating a valid cause of action.

[10] A special plea of sovereign immunity is a type of "plea in bar" "presenting distinct issues of fact which, if proved, create a bar to the plaintiff's right of recovery." *Pike*, 292 Va. at 215 (quoting *Whitley v. Commonwealth*, 260 Va. 482, 493 (2000)).  Although "[t]he party asserting the plea in bar bears the burden of proof[,] . . . 'where no evidence is taken in support of a plea in bar, the trial court, and the appellate court upon review, consider solely the pleadings in resolving the issue presented." *Massenburg*, 298 Va. at 216 (quoting *Lostrangio*, 261 Va. at 497).  "This approach results in functionally de novo review of the trial court's judgment." *Id.*

written order to memorialize those rulings was issued on August 24, 2022, but the rulings therein differed from those recorded in the transcript of the March 3 hearing, which is a part of the record considered by this Court on appeal. Specifically, the order does not address Patton's plea of sovereign immunity or the dismissal of Count III as part of Lucas's demurrer.

I. Patton's Sovereign Immunity Plea

At the March 3 hearing, the circuit court heard argument on the special pleas of sovereign immunity filed by the City, Patton, and Pace. Without distinguishing among those appellees, the circuit court stated that it was "going to sustain the pleas of sovereign immunity" and dismiss those "three defendants." It later reiterated that it "granted the pleas of sovereign immunity and sustained the demurrers." Both the plain language of those statements and the context in which they were made lead this Court to conclude that the circuit court's ruling referred equally to the demurrers and pleas of sovereign immunity filed by the City, Patton, and Pace.

Nevertheless, the final order meant to memorialize those rulings explicitly granted Patton's demurrer without mentioning her plea of sovereign immunity. In contrast, the order specifically granted both the demurrers *and* pleas of sovereign immunity for the City and Pace. Neither the circuit court nor appellees appear to have noticed this discrepancy, let alone intended it. And appellant's challenge to the circuit court's grant of Patton's sovereign immunity plea indicates she too was under the reasonable impression that the circuit court's final order contained that ruling. Considering the impact of such ruling for both appellant and appellees, this Court cannot conclude that its absence from the final order was an intentional reflection of the circuit court's rulings from March 3, 2022.

II. Lucas's Demurrer

As relevant here, the initial demurrers filed by Blount, Lucas, and Lucas-Burke all sought dismissal of Count III (tortious interference) in addition to dismissal of their respective

defamation claims (Counts V, VI, and VII) in the original complaint. In referring to Count III at the March 3 hearing, the circuit court stated that it was "sustaining the demurrer as to the three defendants." Yet, the August 24 order neglected to explicitly dismiss Count III against Lucas, despite dismissing that count against Blount and Lucas-Burke, as well as dismissing the defamation claims against *all three* appellees based on their individual demurrers.[11] Consistent with the reasoning above regarding Patton's plea of sovereign immunity, this Court finds that the final order's silence as to dismissing Count III against Lucas was a mere oversight that neither the circuit court nor the parties noticed at the time.[12]

### III. Clerical Errors Correctible on Remand

Based on the record, as well as the complexity of this multi-count and multi-party case, this Court finds that the above anomalies in the August 24 final order are clerical errors subject to correction under Code § 8.01-428(B).[13]

"[I]t is well settled law in Virginia that a 'court speaks through its orders and those orders are presumed to accurately reflect what transpired.'" *Rubino v. Rubino*, 64 Va. App. 256, 265 (2015) (quoting *McBride v. Commonwealth*, 24 Va. App. 30, 35 (1997)). That presumption, however, can be overcome by "competent evidence" demonstrating a clerical error. *Zhou v.*

---

[11] Count III was dismissed with prejudice, whereas Counts V, VI, and VII (defamation claims) were dismissed without prejudice. The circuit court gave appellant leave to amend the defamation claims, but later dismissed those counts with prejudice after granting appellees' renewed demurrers.

[12] *See also* Rule 1:1(c) ("An order sustaining a demurrer or sustaining a demurrer with prejudice or without leave to amend is sufficient to dispose of the claim(s) or cause(s) of action subject to the demurrer, even if the order does not expressly dismiss the claim(s) or cause(s) of action at issue.").

[13] Code § 8.01-428(B) states, in relevant part: "Clerical mistakes in all judgments or other parts of the record and errors therein arising from oversight or from an inadvertent omission may be corrected by the court at any time on its own initiative or upon the motion of any party and after such notice, as the court may order."

- 18 -

*Zhou*, 38 Va. App. 126, 133 (2002).[14]  Examples of correctable clerical errors include "a misstatement on the record . . . regarding the length of incarceration a defendant was ordered to serve," *Zhou*, 38 Va. App. at 133-34, "a typographical error made by a court reporter while transcribing a court proceeding," and "an unintended error in the drafting of a divorce decree," *Morgan v. Russrand Triangle Assocs., LLC*, 270 Va. 21, 25-26 (2005).  "Such errors cause a final decree or the court's record to fail to 'speak the truth.'"  *Zhou*, 38 Va. App. at 133. Therefore, "'when the justice and truth of the case requires it[,]'" a trial court can exercise its authority under Code § 8.01-428(B) "to correct 'clerical mistakes' in its decree or errors in the record so as to cause the acts and proceedings to be set forth correctly."  *Id.* (quoting *Netzer v. Reynolds*, 231 Va. 444, 449 (1986)).

By comparing the final order against the hearing transcript, this Court believes that the circuit court's intended judgment—granting Patton's plea of sovereign immunity and dismissing Count III against Lucas—was lost in transmission in the five months between the March 3 hearing and entry of the final order on August 24.  The fact that none of the parties, nor the circuit court itself, noticed these omissions in the final order further demonstrates a shared understanding of the intended judgment and a joint assumption that the order would faithfully memorialize the March 3 rulings.  As it currently stands, however, the final order does not meet those expectations.  Accordingly, the August 24 order containing these clerical errors should be corrected on remand to accurately reflect the circuit court's rulings from the March 3 hearing.[15]

---

[14] "Scrivener's or similar errors in the record, which are demonstrably contradicted by all other documents, are clerical mistakes."  *Zhou*, 38 Va. App. at 133.

[15] Because the mistakes in the August 24 order are mere oversights constituting clerical error, this Court will not deem as moot any of appellant's arguments relating to these issues. Rather, this Court will proceed as if the August 24 order included the circuit court's rulings on both Patton's plea of sovereign immunity and dismissal of Count III against Lucas.  Likewise, this Court considers the four orders issued together on August 24 and 25 to constitute a final

I. Preservation

Blount and Lucas-Burke assert in their briefs that appellant failed to preserve her arguments regarding the circuit court's orders sustaining the renewed demurrers to the amended defamation counts. They point to the fact that appellant filed no brief in response to the renewed demurrers, that the circuit court did not conduct a hearing before sustaining the renewed demurrers, and that appellant did not file any objections to the August 25, 2022 orders for which the circuit court waived counsel's endorsement. This Court disagrees. Under the particular circumstances here, this Court finds that appellant did not waive her challenge to the court's dismissal of Counts V, VI, and VII because her objections to the initial demurrers adequately preserved the arguments she makes on appeal.

Ordinarily, this Court "will not consider an argument on appeal which was not presented to the trial court." *Fletcher v. Commonwealth*, 72 Va. App. 493, 510 (2020) (quoting *Ohree v. Commonwealth*, 26 Va. App. 299, 308 (1998)). Thus, to preserve an argument for appeal, appellant must state the objection "with reasonably certainty at the time of the ruling." Rule 5A:18; *see also* Code § 8.01-384(A) ("[I]t shall be sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objections to the action of the court and his grounds therefor.").[16] The purpose of "requir[ing] a litigant to make timely and specific objections[ is] so that the trial court

---

appealable order, thereby conferring jurisdiction upon this Court to resolve the appeal on its merits. *See* Rule 1:1 (finality of orders); Code § 8.01-428(B) (correction of clerical mistakes).

[16] This Court notes that the circuit court's waiver of counsel's endorsement after forgoing another hearing on the amended defamation claims might constitute alternate grounds for refusing to find appellant's arguments on appeal barred by Rule 5A:18. "[I]f a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection shall not thereafter prejudice him on motion for a new trial or on appeal." Code § 8.01-384(A).

has 'an opportunity to rule intelligently on the issues presented, thus avoiding unnecessary appeals and reversals.'" *Brown v. Commonwealth*, 279 Va. 210, 217 (2010) (quoting *West v. Commonwealth*, 43 Va. App. 327, 337 (2004)). If, however, the circuit court "is aware of a litigant's legal position[,] and the litigant did not expressly waive such arguments, the arguments remain preserved for appeal." *Id.*

This Court finds that the record indicates the circuit court's awareness of appellant's legal position regarding all of her claims, including the defamation counts. In response to appellees' initial demurrers, the circuit court held a hearing on March 3, 2022, at which it ruled in favor of appellees and dismissed with prejudice all of appellant's claims except for the three defamation counts against Blount, Lucas, and Lucas-Burke, which it dismissed *without* prejudice and allowed appellant leave to amend. Although the circuit court did not articulate its reasoning in making those rulings, appellant made specific arguments at the hearing objecting to the demurrers and dismissal of her claims. By doing so, appellant informed the circuit court as to the nature of her belief that the complaint sufficiently stated a cause of action for each enumerated claim. That argument, which is the basis of appellant's appeal, therefore remained preserved without appellant having to restate it again in response to the renewed demurrers. *See* Code § 8.01-384(A) ("No party, after having made an objection or motion known to the court, shall be required to make such objection or motion again in order to preserve his right to appeal, challenge, or move for reconsideration of, a ruling, order, or action of the court.").

Indeed, the circuit court appears to have held the same opinion as to the continuing nature of appellant's objection because its instructions to the parties at the March 3 hearing, in anticipation of appellees filing renewed demurrers, indicate its intention to rule on the sufficiency of the amended complaint without requiring further argument or briefing from appellant. Those directives serve as evidence not only that appellant had no obligation to submit

additional briefing after filing her amended complaint, but also that the circuit court would automatically take her arguments from the March 3 hearing into account when considering the sufficiency of the amended defamation counts.

In fact, each of the August 25 orders sustaining the renewed demurrers contained a handwritten note explaining that the court had waived counsel's endorsement but that "objections are noted and preserved." Taken together, these circumstances lead this Court to conclude that the circuit court was aware of appellant's legal position and was thus afforded the "opportunity to rule intelligently on the issues presented" when issuing the August 24 and 25, 2022 orders sustaining both the initial and amended demurrers.[17]

Furthermore, by including Counts I, II, III, and IV in her amended complaint, along with the amended defamation counts, appellant preserved for appeal her claim that each of the seven counts pled sufficient facts to overcome *any* demurrer. *Contra Lewis v. Kei*, 281 Va. 715, 719 (2011) (holding that where "a circuit court sustains a demurrer to an amended complaint that does not incorporate or refer to any of the allegations that were set forth in a prior complaint," the appellate court "'will consider only the allegations contained in the amended pleading to which the demurrer was sustained'" (quoting *Yuzefovsky v. St. John's Wood Apartments*, 261 Va. 97, 102 (2001))). This Court therefore holds that appellant has adequately preserved for appellate review her objection to the circuit court's dismissal with prejudice all alleged claims.[18]

---

[17] Subject to the clerical errors discussed above, the first order entered August 24 memorializes the rulings the circuit court made at the March 3 hearing. Counsel for appellant signed that order as "Seen and objected to for reasons stated in open court and in plaintiff's briefing.

[18] Appellant has *not*, however, assigned error to the circuit court's dismissal without prejudice of the three initial defamation claims contained in the original complaint. This Court is "limited to reviewing the assignments of error presented by the litigant." *Banks v. Commonwealth*, 67 Va. App. 273, 289 (2017); *see also* Rule 5A:20(c)(1) ("Only assignments of error listed in the brief will be noticed by this Court.").

II.  Sufficiency

The City, Patton, Pace, and Lucas-Burke argue on brief that the generic nature of appellant's assignments of error is insufficient to support the arguments she asserts in her brief. This Court disagrees.

"The purpose of assignments of error is to 'point out the errors with reasonable certainty in order to direct this court and opposing counsel to the points on which appellant intends to ask a reversal of the judgment, and to limit discussion to these points.'"  *Delaune v. Commonwealth*, 76 Va. App. 372, 380 (2023) (quoting *Chesapeake Hosp. Auth. v. Commonwealth, Dep't of Tax'n*, 262 Va. 551, 556 n.2 (2001)).  Appellant's assignments of error follow a similar formula, using substantially similar words, first listing the relevant claim and then alleging that the facts in the pleadings were legally sufficient to establish each cause of action.  The lack of further detail in the assignments of error does not render them insufficient for consideration by this Court because appellant clearly establishes her objection to the circuit court's judgment, which itself lacked specificity.  *See* Rule 5A:20(c)(2).

In ruling on appellees' demurrers, and the special pleas of sovereign immunity, the circuit court heard no evidence and made no specific findings of fact or conclusions of law either from the bench or in its written orders.  Consequently, the only error appellant could, and does, point to on appeal is the circuit court's grant of those demurrers and special pleas.  *See Carroll v. Commonwealth*, 280 Va. 641, 649 (2010) (holding that appellant has the duty to "lay his finger on the error" he intends to raise on appeal (quoting *First Nat'l Bank v. William R. Trigg Co.*, 106 Va. 327, 342 (1907))).

Appellant's challenge, therefore, is based on the standard of review for demurrers: whether the complaint states a cause of action upon which the requested relief may be granted.[19] Because such determinations are reviewed de novo on appeal, the lack of reasoning articulated by the circuit court in rendering its judgment does not preclude this Court from conducting an independent analysis as to the sufficiency of appellant's pleadings.[20] Accordingly, this Court's assessment dictates whether the circuit court erred in granting the special pleas and sustaining the demurrers.

### III. Abandonment

As part of assignments of error one through six, appellant claims that the circuit court erred in sustaining appellees' demurrers without granting her leave to amend Counts I, II, III, and IV from the original complaint.[21] She also argues, in assignments of error one and two, that the circuit court erroneously granted the City's, Patton's, and Pace's special pleas of sovereign immunity because they "presented no evidence to meet their burden of establishing their

---

[19] This Court finds that appellees were given sufficient notice as to the arguments appellant makes on appeal, namely, that the pleadings stated a cause of action for each claim supported by adequate facts. Moreover, the Supreme Court has applied Code § 8.01-273 "to bar consideration on appeal of an argument that was not included in the defendant's demurrer." *Theologis v. Weiler*, 76 Va. App. 596, 604 (2023). The statute "requires that each demurrant 'state specifically the grounds on which the demurrant concludes that the pleading is insufficient at law,' and '*[n]o grounds other than those stated specifically in the demurrer shall be considered by the court*.'" *Id.* (alteration in original) (quoting Code § 8.01-273(A)). Therefore, none of the appellees here could "benefit from an argument that he [or she] did not include in his *own* demurrer." *Id.*

[20] The same rationale applies for reviewing whether the pleas of sovereign immunity should have been granted. *See Massenburg*, 298 Va. at 216 (recognizing that "where no evidence is taken in support of a plea in bar, the trial court, and the appellate court upon review, consider solely the pleadings in resolving the issue presented" (quoting *Lostrangio*, 261 Va. at 497)).

[21] Assignments of error 1(c), 2(c), 3(b), 4(b), 5(b), and 6(d).

defenses."[22] Despite including those two claims in her assignments of error, appellant did not argue either in her opening brief. *See Ceres Marine Terminals v. Armstrong*, 59 Va. App. 694, 708 (2012) ("[A]n appellant must supply this Court with principles of law and authorities in support of a particular argument."). Accordingly, this Court considers those arguments abandoned and will not address them on appeal. *See Bartley v. Commonwealth*, 67 Va. App. 740, 744 (2017) ("Unsupported assertions of error 'do not merit appellate consideration.'" (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008))).

Under Rule 5A:20(e), an opening brief must contain "[t]he standard of review and the argument (including principles of law and authorities) relating to each assignment of error." "A significant omission in this regard will result in waiver of the argument on appeal." *Ceres*, 59 Va. App. at 708; *see also Bartley*, 67 Va. App. at 746 ("[I]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her." (quoting *Sneed v. Bd. of Prof. Resp. of the Sup. Ct. of Tenn.*, 301 S.W.3d 603, 615 (Tenn. 2010))). Thus, "where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Bartley*, 67 Va. App. at 746 (quoting *Sneed*, 301 S.W.3d at 615). Appellant's abandonment of the arguments above renders those subsections in her assignments of error waived on this appeal.

Counts I and II: Wrongful Termination

Appellant first argues that the circuit court erred in dismissing her counts of wrongful termination against the City, Patton, and Pace. She asserts that the circuit court should neither have granted the special pleas of sovereign immunity nor sustained the demurrers filed by appellees. This Court disagrees, finding that the inadequacy of appellant's pleadings justifies

---

[22] Assignments of error 1(a) and 2(a). This Court notes that argument mischaracterizes the law. Under general principles regarding special pleas, a circuit court may resolve a special plea solely on the pleadings without taking any evidence. *See Massenburg*, 298 Va. at 216.

dismissal of the charges against these three appellees on both sovereign immunity and demurrer grounds.

*Immunity of the City*

"Sovereign immunity is a rule of social policy, which protects the state from burdensome interference with the performance of its governmental functions and preserves its control over state funds, property, and instrumentalities." *Cunningham*, 268 Va. at 633 (quoting *City of Virginia Beach v. Carmichael Dev. Co.*, 259 Va. 493, 499 (2000)). Generally speaking, this doctrine renders "the Commonwealth and its agencies . . . immune from liability for the tortious acts or omissions of their agents and employees" unless an "express statutory or constitutional provision[] waiv[es] immunity." *Muwahhid*, 77 Va. App. at 829 (second and third alterations in original) (quoting *Melanson v. Commonwealth*, 261 Va. 178, 181 (2001)). "Unlike counties, which share fully in the sovereign's immunity from tort," municipalities are only entitled to such protection for "tort liability arising from governmental functions, but not proprietary functions." *Massenburg v. City of Petersburg*, 298 Va. 212, 217-18 (2019).[23]

"A municipality engages in a governmental function when it exercises powers and duties exclusively for the public welfare, effectively acting 'as an agency of the state to enable it to better govern that portion of its people residing within its corporate limits.'" *Id.* at 218 (quoting *Hoggard v. City of Richmond*, 172 Va. 145, 147 (1939)). "Proprietary functions, however, involve the municipality's exercise of its power and privileges primarily for its own benefit[] . . . even though 'the general public may derive a common benefit' from their performance." *Id.* (quoting *Hoggard*, 172 Va. at 148). Thus, the test for differentiating between these two

---

[23] Although the General Assembly has "enact[ed] a limited waiver of [the Commonwealth's sovereign] immunity in the Virginia Tort Claims Act[,] . . . [c]laims against localities and their employees, however, continue to be governed by the common-law principles." *Patterson*, 301 Va. at 189 (quoting *AlBritton v. Commonwealth*, 299 Va. 392, 399 (2021)).

functions is "whether, in providing such services, the governmental entity is exercising the powers and duties of government conferred by law for the general benefit and well-being of its citizens." *Massenburg*, 298 Va. at 218 (quoting *Carter v. Chesterfield Cnty. Health Comm'n*, 259 Va. 588, 593 (2000)).[24]

Accordingly, while "routine maintenance or operation of a municipal service is proprietary[,]" the Supreme Court has "consistently held that when a municipality plans, designs, regulates or provides a service for the common good, it performs a governmental function."[25] *Cunningham*, 268 Va. at 634*; compare Edwards v. City of Portsmouth*, 237 Va. 167, 172 (1989) (provision of ambulance services is a governmental function), *with City of Richmond v. Branch*, 205 Va. 424, 428 (1964) (routine maintenance of existing streets is a proprietary function). Over time, the Supreme Court has categorically classified certain municipal actions as governmental functions based on their contribution to the public welfare.[26] This includes operation of a fire department, provision of hospital and ambulance services, emergency removal of snow from

---

[24] "[W]here governmental and proprietary functions coincide, the governmental function is the overriding factor." *Trans., Inc. v. City of Falls Church*, 219 Va. 1004, 1006 (1979) (quoting *Taylor v. Newport News*, 214 Va. 9, 10 (1973)); *see also Bialk v. City of Hampton*, 242 Va. 56, 58 (1991) (holding that clearing streets after a large snowstorm was both a governmental act in opening streets to vital public services and a proprietary act in maintaining the surface of streets).

[25] Likewise, a function that "entails the exercise of an entity's political, discretionary, or legislative authority" is governmental in nature. *Cunningham*, 268 Va. at 634. Conversely, "[i]f the function is a ministerial act and involves no discretion, it is proprietary." *Id.* "In determining whether a municipality is engaged in a governmental or proprietary function, this Court has rejected a simple inquiry into whether private entities also perform the same service." *Massenburg*, 298 Va. at 218.

[26] *See, e .g.*, *Gambrell v. City of Norfolk*, 267 Va. 353, 359 (2004) (holding that firefighting falls under a municipality's power and duty to provide emergency services "for the general safety and welfare of the citizenry"); *Trans., Inc.*, 219 Va. at 1006 (holding a municipality "immune from liability for negligence in failing to repair a malfunctioning [traffic] signal" because maintaining such signals served "the purpose of protecting the general public health and safety" (quoting *Taylor*, 214 Va. at 10)).

roads, and even garbage collection. *See Massenburg*, 298 Va. at 218; *City of Richmond v. Long*, 58 Va. (17 Gratt.) 375 (1867); *Edwards*, 237 Va. at 171 (finding ambulance services "akin to the provision of hospital services[] . . . because it is difficult to imagine anything more directly tied to the health, safety, and welfare of the citizens"); *Bialk v. City of Hampton*, 242 Va. 56, 58 (1991) (holding that clearing streets for vital public services after a large snowstorm was a governmental act); *Ashbury v. Norfolk*, 152 Va. 278 (1929) (deeming garbage collection a governmental function because it concerned the preservation of public health).

Under this framework, the provision and management of law enforcement is no different from the above services; it is an exercise of police power for the good of the public.[27] The Supreme Court has even recognized that, like operating a jail, "maintenance of a police force is a governmental function." *Patterson*, 301 Va. at 190 (quoting *Niese*, 264 Va. at 240); *see also Short Pump Town Ctr. Cmty. Dev. Auth. v. Hahn*, 262 Va. 733, 743 n.11 (2001) (holding that operating a jail is a governmental function). In tasking the city manager with such maintenance, the Portsmouth City Charter and Code confer upon the city manager full authority over the composition of the police department.[28] Implied within that discretionary authority is the ability to both hire and fire members of the police force, including the police chief, as deemed necessary

---

[27] The police not only engage in crime prevention and investigation but also provide community caretaking services. *See also Edwards*, 237 Va. at 171 (holding that providing ambulance services is an exercise of police power, and rejecting "the argument that ambulance services are not governmental simply because similar services may be provided by private entities").

[28] *See* Portsmouth City Charter, Sec. 5.02(b) (assigning the city manager the power and duty "[t]o appoint and manage all employees in all departments, offices, and agencies of the city"; Portsmouth City Code, Sec. 2-166 (directing the city manager to "employ officers and employees needed to operate" "all city departments necessary to perform city governmental functions"), 27-1 (mandating the police department to "consist of a chief and such officers and employees as may, from time to time, be deemed necessary by the city manager"), and 27-2 ("The chief of police department shall be appointed by the city manager.").

to ensure the continued efficacy of the department as a whole.[29]  *See Niese*, 264 Va. at 240

("[T]he decision to retain an individual police officer is an integral part of the governmental

function of maintaining a police force." (quoting *Hoggard*, 172 Va. at 148)).

Thus, because management of an effective police force necessarily entails employment

decisions, this Court finds that appellant's termination occurred within the scope of the City's

governmental functions.  Accordingly, the City cannot be held liable for such decision and the

circuit court did not err in sustaining the City's pleas of sovereign immunity to appellant's claims

of wrongful termination via respondeat superior.  *See Niese*, 264 Va. at 239 ("[A] municipality is

immune from liability for intentional torts committed by an employee during the performance of

a governmental function."); *Hoggard*, 172 Va. at 154 (holding that municipalities are not liable

for the "negligent acts or omissions of its officers and agents . . . in the exercise of the police

power, or . . . where the act or omission occurs in the exercise of what are deemed to be

governmental powers").

*Immunity of the City Managers*

That brings us next to the question of whether Patton and Pace benefit from "the

derivative sovereign immunity of a municipal employee . . . ."  *Patterson*, 301 Va. at 189.  "The

first step in this analysis is to determine the scope of the governmental entity's immunity."  *Id.*

Having already found that control over its police force constitutes a governmental function, the

City is entitled to absolute sovereign immunity against appellant's wrongful termination claims.

"The second step in the analysis engages the premise that 'government can function only through

its servants,' and thus, 'certain of those servants must enjoy the same immunity in the

---

[29] Although routine cleaning or building maintenance for the department's physical facilities may very well constitute a proprietary function, managing the conduct and employment of individual officers, including the police chief, qualifies as a governmental function under the framework established by Supreme Court precedent.

performance of their discretionary duties as the government enjoys.'" *Id.* at 190 (quoting *First Va. Bank-Colonial v. Baker*, 225 Va. 72, 79 (1983)); *see also Messina v. Burden*, 228 Va. 301, 312 (1984) ("If an individual works for an immune governmental entity then, in a proper case, that individual will be eligible for the protection afforded by the [sovereign immunity] doctrine.").

High-ranking officials are generally entitled to derivative sovereign immunity by nature of their position within the governing entity. *See Messina*, 228 Va. at 309. "Governors, judges, members of state and local legislative bodies, and other high level governmental officials have generally been accorded absolute immunity." *Id.*; *see also James v. Jane*, 221 Va. 43, 53 (1980).[30] This Court finds that the position of city manager in Portsmouth fits that classification.

Notwithstanding the immunity bestowed upon Patton and Pace during their tenure as city managers, sovereign immunity does not protect municipal employees who "commit[] *intentional* torts, irrespective of whether they acted within or without the scope of their employment . . . ." *Fox v. Deese*, 234 Va. 412, 424 (1987) (internal citations omitted).[31] A cause of action for wrongful termination is an intentional tort. Consequently, the final question in this analysis is whether appellant has established a prima facie case of wrongful termination against Patton and Pace. If those claims cannot survive appellees' demurrers, the shield of sovereign immunity remains intact.

---

[30] "General agreement breaks down, however, the farther one moves away from the highest levels of government. Nevertheless, on a case-by-case basis, this Court has extended immunity to other governmental officials of lesser rank." *Messina*, 228 Va. at 309 (internal citation omitted).

[31] Generally, "[c]onduct outside the scope of the employment is not protected by sovereign immunity." *Tomlin v. McKenzie*, 251 Va. 478, 482 (1996); *see also Fox*, 234 Va. at 424.

Whether a plaintiff has adequately stated a claim for wrongful termination depends on the nature of the employment contract. Here, appellant acknowledges in the complaint that she was an at-will employee of the City. "Virginia adheres to the employment at-will doctrine, which allows that '[a]n employee remains at liberty to leave his employment for any reason or for no reason,' and '[b]y the same token, the employer is free to terminate the employment relationship without the need to articulate a reason." *Francis v. Nat'l Accrediting Comm'n of Career Arts & Sciences, Inc.*, 293 Va. 167, 171-72 (2017) (alterations in original) (quoting *Johnston v. William E. Wood Assocs.*, 292 Va. 222, 225-26 (2016)). As a result, no cause of action exists for wrongful termination of an at-will employment contract unless the plaintiff sufficiently pleads a *Bowman* claim.

"The phrase '*Bowman* claim' stems from this Court's decision in *Bowman v. State Bank of Keysville*, 229 Va. 534 (1985), in which we first recognized an exception to the doctrine of employment-at-will based on an employer's violation of public policy in the discharge of an employee." *Rowan v. Tractor Supply Co.*, 263 Va. 209, 213 (2002). There, the Supreme Court concluded that the discharge was tortious "because the employer had misused its freedom to terminate the service of at-will employees in order to subvert a right guaranteed to stockholders by statute." *Francis*, 293 Va. at 174 (quoting *Miller v. SEVAMP, Inc.*, 234 Va. 462, 467 (1987)). Since then, the Supreme Court has recognized "only three circumstances or 'scenarios'"—the so-called *Bowman* claims or exceptions—in which "a claim was sufficient to constitute a common law cause of action for wrongful termination of an at-will employee under the *Bowman* public policy exception[.]" *Id.* Those claims arise when (1) "an employer violated a policy enabling the exercise of an employee's statutorily created right"; (2) "the public policy violated by the employer was explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy"; or (3) "the

discharge was based on the employee's refusal to engage in a criminal act." *Id.* at 172-73 (quoting *Rowan*, 263 Va. at 213-14). When addressing "cases dealing with *Bowman*-type exceptions to the employment at-will doctrine, [the Supreme Court] has consistently characterized such exceptions as 'narrow.'" *Id.* at 172.

Appellant has not pled sufficient facts in either Count I or II to establish a cause of action for her termination. In Count I she alleges that she "was terminated by Pace for refusing Patton's illegal order not to investigate the monument incident." Her characterization of such order as an "unlawful, illegal directive[]" is not grounded in the alleged facts, and appellant does not plead that she was terminated for refusal "to engage in a criminal act" (*Bowman* Scenario 3). *Francis*, 293 Va. at 173 (emphasis added) (quoting *Rowan*, 263 Va. at 214). Albeit rephrased, Count II relies upon the same rationale—that appellant was terminated because she investigated the monument incident despite Patton's directive to the contrary. Accordingly, neither count states a cause of action under *Bowman* Scenario 3.[32]

Appellant also alleges in both Counts I and II that her termination was "in violation of the clear public policies of the Commonwealth of Virginia."[33] That conclusory statement does not establish an exception to *Bowman* under Scenarios 1 or 2. *See Francis*, 293 Va. at 173 ("[T]o successfully state a claim for wrongful discharge under *Bowman* Scenario 1, it must be shown

---

[32] In Count II, appellant alleged that she was "terminated in retaliation for complying with the law." That assertion, as stated, does not fall into any of the three well-established exceptions under *Bowman*. Nor does the allegation that Patton breached a duty to appellant by placing her on administrative leave. Although Scenario 3 permits a claim of retaliatory termination for an employee's refusal "to engage in a criminal act[,]" the Supreme Court has *not* recognized a general claim of retaliation against an employee for "complying with the law."

[33] In Counts I and II, appellant merely alleges that the "clear public policies" Patton and Pace violated included, "but [are] not limited to, policies embodied in Article 1, § 11 of the Constitution of Virginia, the Code of Virginia, and the City's own regulations and policies." That unspecific assertion is inadequate to meet the pleading requirements for a *Bowman* claim. *See Francis*, 293 Va. at 172-73.

that the employer's termination violated public policy. . . . [And] it is important to discern what right was conferred on an employee by statute, and then whether the employer's termination violated the public policy underlying that right."). Appellant identified no specific public policy or accompanying statute in connection with her claim of retaliatory termination. *See id.* at 172 ("[W]hile virtually every statute expresses a public policy of some sort, we continue . . . to hold that termination of an employee in violation of the policy underlying any one statute does not automatically give rise to a common law cause of action for wrongful discharge." (second alteration in original) (quoting *Rowan*, 263 Va. at 213)).

The complaint thus fails to show that Patton or Pace violated a public policy either designed to enable the exercise of appellant's "statutorily created right" (*Bowman* Scenario 1) or "explicitly expressed in the statute" (*Bowman* Scenario 2). Nor does it establish that appellant "was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy" (*Bowman* Scenario 2). Consequently, appellant has not sufficiently demonstrated that Patton and Pace breached any duty owed to appellant under the law.

Finally, this Court concludes that appellant has not adequately established that her termination was a result of retaliation by either Patton or Pace. To find otherwise would require sufficient facts of causation, which are conspicuously absent here. By keeping the *Bowman* exceptions "narrow," the Supreme Court continues to protect the right of employers to terminate their at-will employees for any or no cause at all so long as the termination is not the result of retaliation under any of the *Bowman* scenarios. *See Francis*, 293 Va. at 172.

Consistent with that approach, this Court finds appellant's complaint insufficient to establish (1) that Patton or Pace took any retaliatory action toward appellant, and (2) that the proximate cause of appellant's termination was the alleged retaliation. Although Patton placed appellant on administrative leave while investigating the propriety of her actions in the aftermath

of the monument incident, he did not take any action to remove her as police chief. Appellant does not allege that Patton made any verbal or written statements recommending appellant's termination, either prior or subsequent to Patton's resignation on September 8, 2020.

Nor does appellant allege outright that Patton terminated her; instead, she attempts to insert Patton into this claim by alleging that Patton caused Pace to fire appellant as an act of retaliation. The pleadings do not support that misguided claim. *See Wetlands Am. Trust, Inc. v. White Cloud Nine Ventures, L.P.*, 291 Va. 153, 174 (2016) ("[A] litigant's pleadings are as essential as his proof . . . . Thus, a court is not permitted to enter a decree or judgment order based on facts not alleged or on a right not pleaded and claimed." (quoting *Dabney v. Augusta Mut. Ins. Co.*, 282 Va. 78, 86 (2011))). The complaint, therefore, fails to show a causal connection necessary for successfully pleading a wrongful termination claim.

In sum, because appellant did not establish a prima facie claim of wrongful termination, Patton's and Pace's derivative sovereign immunity remained intact. Accordingly, the circuit court did not err in sustaining appellees' demurrers and special pleas. *See Francis*, 293 Va. at 175 ("[B]ecause the amended complaint . . . failed to state a claim for wrongful termination under *Bowman*, the circuit court did not err in dismissing it with prejudice.").

Count III: Tortious Interference

In general, "[t]he elements required for a prima facie showing" of tortious interference by a third party are: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Chaves*

*v. Johnson*, 230 Va. 112, 120 (1985); *see also Schaecher v. Bouffault*, 290 Va. 83, 106 (2015).[34] But the mere fact that "Virginia recognizes the existence of the tort . . . does not mean that every contract relationship which is terminated or disrupted through the interference of a third party . . . will result in tort liability for that party." *Lewis-Gale Med. Ctr., LLC v. Alldredge*, 282 Va. 141, 153 (2011).

To establish a prima facie case of tortious interference where the contract is terminable at will, the plaintiff "'must allege and prove not only an *intentional* interference that caused the termination of the at-will contract, but also that the defendant employed "*improper* methods.""" *Perk v. Vector Res. Grp., Lt.*, 253 Va. 310, 314 (1997) (quoting *Duggin v. Adams*, 234 Va. 221, 226-27 (1987)). *See Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 254 Va. 408, 413 (1997) ("[N]ot all business relationships are entitled to the same level of protection and . . . a contract not terminable at will was entitled to more protection than a contract terminable at will."). "Interference is considered 'improper' if it is illegal, independently tortious, or violates an established standard of trade or profession." *Dunn*, 281 Va. at 559; *see also Lewis-Gale Med. Ctr.*, 282 Va. at 153 (holding that, for at-will employees, "the law provides a remedy in tort only

---

[34] The Restatement (Second) Torts § 766 (1977) describes the tort of "intentional interference with performance of contract by third party" as follows:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Both *Chaves*, 230 Va. at 120, and *Francis*, 296 Va. at 363, quote this language verbatim.

- 35 -

where the plaintiff can prove that the third party's actions were illegal or fell so far outside the accepted practice of th[e] 'rough-and-tumble world' as to constitute improper methods").[35]

Appellant's pleadings clearly define her position as police chief "terminable at will" by the city manager. Therefore, to defeat the demurrers, appellant needed to specifically allege facts demonstrating that appellees' interference with her at-will employment was conducted by engaging in "improper" conduct. Her complaint fails to do so for the claims against Lucas and Lucas-Burke.

Although she did not explicitly acknowledge or name the element of "improper methods," appellant's allegation that appellees interfered with her employment "by lying" is premised exclusively on her claims of defamation against them. *See Dunn*, 281 Va. at 559 (acknowledging that defamation can constitute an improper method). In doing so, she asserts only that appellees "manufactured falsehoods and asserted them as factual" to create "political pressure . . . for the termination of [appellant] based on the[ ] manufactured falsehoods." That allegation relies on the false and defamatory nature of the statements made, without which mere public criticism does not support a cause of action for tortious interference in this case. *See, e.g.*, *Chaves*, 230 Va. at 120-22 (considering the elements of a cause of action for tortious interference "accomplished by words"); Code § 8.01-233.2 (establishing immunity from tort liability for statements "regarding matters of public concern" made without actual malice).

---

[35] The methods used "need not be 'inherently illegal or tortious' to support a cause of action for tortious interference by 'improper method.'" *Maximus*, 254 Va. at 414; *see also Duggin*, 234 Va. at 228 (identifying sufficient "improper" actions, such as unfair competition or unethical conduct, that are not themselves tortious or illegal). Rather, plaintiff must prove "'only that the interference was intentional and improper under the circumstances' of the particular case." *Lewis-Gale Med. Ctr.*, 282 Va. at 150 (quoting *Maximus*, 254 Va. at 414). Here, however, appellant's allegation that appellees "manufactured falsehoods" raises a claim of defamation as a tortious action.

As discussed in the section below regarding the defamation claims, this Court finds that appellant failed to sufficiently state a cause of action for defamation against Lucas and Lucas-Burke, in part because appellant did not adequately plead the falsity of the statements or actual malice.[36] Consequently, appellant's tortious interference claims against Lucas and Lucas-Burke for "lying"—based solely on supposedly defamatory statements—must fail for lack of sufficient facts establishing an "improper method" of interference. *See, e.g.*, *Fairfax v. CVS Corp.*, 2 F.4th 286, 296 (4th Cir. 2021) ("[O]ur analysis of [plaintiff's] failure to sufficiently plead actual malice [for his defamation claim] applies equally to his claim for intentional infliction of emotional distress.").[37]

In contrast, the remaining claim against Blount should be reinstated and remanded at this stage in the litigation. Appellant pleads sufficient facts of defamation and actual malice to demonstrate that Blount engaged in "improper" methods when calling for appellant's

---

[36] Appellant argues on brief it was a "reasonable inference" that "she was fired following the [city council's] receipt of Blount's letter" during Pace's tenure as city manager, but that argument does not address the causality of Lucas's and Lucas-Burke's statements.

[37] This Court is mindful of its "obligation to decide cases on the best and narrowest grounds available." *Theologis*, 76 Va. App. at 604 (quoting *Esposito v. Va. State Police*, 74 Va. App. 130, 134 (2022))). Accordingly, under the doctrine of judicial restraint, this Court refrains from opining on the interplay among the following authorities in the context of the tortious interference claim against Lucas-Burke: Code § 8.01-233.2 (providing immunity from tort liability based on statements made to "any local governmental entity concerning matters properly before such body"); Portsmouth City Charter Section 3.11 (prohibiting city council members from interfering "in any way" with the "removal of officers and employees of the city"); and Supreme Court rulings addressing the sufficiency of tortious interference pleadings against an agent of a municipality. *See, e.g.*, *Francis Hosp., Inc. v. Read Prop., LLC*, 296 Va. 358, 363 (2018) ("[O]nly a party *outside* the contractual relationship with the plaintiff is subject to liability as an interferor."); *Fox*, 234 Va. at 427 (holding that a City employee "acting within the scope of his employment" is "an agent of the City" such that "the City's contract [with plaintiff is] also his contract" and thus he cannot, as a matter of law, be held liable for "intentionally interfere[ing] with his own contract").

termination.[38] Thus, the circuit court erred in granting Blount's demurrers for both the tortious interference and defamation counts.

Count IV: Gross Negligence

The basis for appellant's claims of gross negligence against Patton and Lucas-Burke is her termination as police chief. Relying on the same facts alleged in Counts I and II, appellant asserts that Patton's negligence in responding to the aftermath of the monument incident resulted in her termination. Similarly, appellant attributes her termination to Lucas-Burke's demands for such. She argues that Lucas-Burke's statements to city officials constitute gross negligence because they are expressly prohibited by the Portsmouth City Code. This Court disagrees, finding that appellant's pleadings do not allege sufficient facts to establish a prima facie case of gross negligence against either Patton or Lucas-Burke.

"All negligence causes of action are based on allegations that a person having a duty of care to another person violated that duty of care through actions that were the proximate cause of injury to the other person." *Steward ex rel. Steward v. Holland Fam. Props., LLC*, 284 Va. 282, 286 (2012). Thus, to establish a prima facie case of negligence, a plaintiff must offer sufficient facts to establish all four legally distinct elements: "a legal duty on the part of the defendant, a breach of that duty, and [a] showing that such breach was the proximate cause of injury, resulting

---

[38] No privilege renders Blount immune from suit for tortious interference on the adequately pled grounds of malicious defamation. *See Givago*, 300 Va. at 267 ("Absolute privilege does not apply to non-defamation torts in Virginia, specifically including malicious abuse of process, tortious interference with contractual relations, and civil conspiracy."); *Maximus*, 254 Va. at 413 ("Other than the 'improper methods' requirement, no additional elements were imposed to establish a prima facie case, even when an affirmative defense was asserted.").

This Court recognizes, however, that Blount is not precluded from raising any affirmative defenses of justification or privilege on remand for both the tortious interference and defamation counts. *See Chaves*, 230 Va. at 121 (holding that the burden for proving an affirmative defense of "justification or privilege" rests upon the defendant); *Fox*, 234 Va. at 427 ("Once a prima facie showing is made, the burden of proof shifts to [defendant] to show the affirmative defense of justification or privilege.").

in damage to the plaintiff." *Blue Ridge Service Corp. of Va. v. Saxon Shoes, Inc.*, 271 Va. 206, 218 (2006).[39]

For "simple negligence," a plaintiff need only show that, in breaching his duty, the defendant failed "to use the degree of care that an ordinarily prudent person would exercise under similar circumstances to avoid injury to another." *Cowan v. Hospice Support Care, Inc.*, 268 Va. 482, 486 (2004). "Gross negligence," however, is "a heedless and palpable violation of legal duty respecting the rights of others which amounts to the *absence of slight diligence*, or the *want of even scant care*." *Patterson*, 301 Va. at 198 (quoting *Commonwealth v. Giddens*, 295 Va. 607, 613 (2018)). For claims of gross negligence, a plaintiff must adequately allege that the breach of duty "would shock fair-minded persons," *Elliott v. Carter*, 292 Va. 618, 622 (2016) (quoting *Cowan*, 268 Va. at 487), by "show[ing] an utter disregard of prudence amounting to complete neglect of the safety of another," *Frazier v. City of Norfolk*, 234 Va. 388, 393 (1987).[40]

As to each of the required elements for gross negligence, appellant's pleadings offer merely conclusory statements of law that cannot support a cause of action. *See Patterson*, 301 Va. at 198. She alleges that Patton and Lucas-Burke (a) "had a duty not to take action that interfered with [appellant]'s right to be free from unlawful termination"; (b) "knew or should have known that the ramifications of their actions . . . would result in harm to [appellant]"; and (c) "consciously disregarded the risk of this harm" by "intentionally disregard[ing] [appellant]'s rights[.]" She then concludes that "[Lucas-]Burke's and Patton's breaches are direct and

---

[39] "[D]amages are generally recoverable for the reasonable and proximate consequences of the breach of duty . . . [but] are not presumed." *Gilliam v. Immel*, 293 Va. 18, 26 n.6, 28 (2017).

[40] The third level of negligence recognized by the Supreme Court is "willful and wanton negligence," defined as "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." *Doe by and Through Doe v. Baker*, 299 Va. 628, 652 (2021) (quoting *Cowan*, 268 Va. at 487).

proximate causes of [appellant]'s damages." This Court finds that appellant's pleadings neither establish that Patton and Lucas-Burke breached a legal duty to appellant nor that such alleged breach was a proximate cause of appellant's termination.

Starting with Patton, appellant appears to presume that the position of city manager imputed to Patton a duty to refrain from taking any action that would "interfere[] with [appellant]'s right to be free from unlawful termination." This assertion is inadequate. Appellant presents no facts or legal authority in support of her premise that the city manager owes such a duty to the police chief. *See Cline v. Dunlora South, LLC*, 284 Va. 102, 106 (2012) ("Whether such duty exists is 'a pure question of law.'" (quoting *Yuzefovsky*, 261 Va. at 106)).[41]

Rather, the Portsmouth City Code and City Charter grants the city manager authority to appoint and terminate all positions within the police department, including the police chief. *See* Portsmouth City Charter, Sec. 5.02; Portsmouth City Code, Sec. 2-166, 27-1, and 27-2; *see also Steward*, 284 Va. at 286 ("The standard of care required to comply with the duty of care may be established by the common law or by statute."). And here, the crux of appellant's claim is that her termination was "unlawful," but she does not explain what that means in the context of her at-will employment with the City.[42] Consequently, appellant does not allege facts showing that her termination as police chief was "unlawful" or that such termination was caused by any action Patton took in contravention of a legal duty. Indeed, it was Pace who fired appellant over two months after she replaced Patton as city manager.

---

[41] "A claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care" or when the evidence fails to establish a legal duty owed to the plaintiff. *Giddens*, 295 Va. at 614 (quoting *Elliott*, 292 Va. at 622).

[42] Similarly, appellant does not plead facts to support her further assertions that Patton gave "illegal" orders to her or that Patton acted "unlawfully" in placing appellant on administrative leave.

"The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." *Ford Motor Co. v. Boomer*, 285 Va. 141, 150 (2013) (quoting *Wells v. Whitaker*, 207 Va. 616, 622 (1966)). "[T]o impose liability upon one person for damages incurred by another, it must be shown that the negligent conduct was a necessary physical antecedent of the damages." *Id.* (quoting *Wells*, 207 Va. at 622). Thus, the term "proximate cause" represents a "descriptive phrase for the limits the law has placed upon an actor's responsibility for his conduct." *Wells*, 207 Va. at 622.

Although proximate cause is generally a question of fact to be resolved by the factfinder, "[t]he evidence tending to show causal connection must be sufficient to take the question out of the realm of mere conjecture, or speculation, and into the realm of legitimate inference . . . ." *Estate of Moses ex rel. Moses v. Sw. Va. Transit Mgmt. Co.*, 273 Va. 672, 679-80 (2007); *see also Norfolk & W. Ry. Co. v. Wright*, 217 Va. 515, 520 (1976) ("Not every inference that springs to mind is legally sufficient."). In the absence of sufficient evidence of causation, a prima facie claim of negligence does not exist as a matter of law, regardless of whether the evidence shows that the defendant breached a duty owed to the plaintiff. *See, e.g., Blue Ridge Service Corp.*, 271 Va. at 218-19 (holding that the trial court "abused its discretion when it denied" defendant's motion to strike plaintiff's evidence and submitted the case to the jury in the "absence of a prima facie case of negligence").

Here, not only has appellant failed to establish that Patton breached a legal duty owed to appellant, but she also has not sufficiently shown a causal link between Patton's actions and appellant's termination at the hands of Pace. Thus, appellant's complaint does not state a cause of action for even simple negligence, let alone gross negligence. Moreover, because the complaint does not sufficiently allege gross negligence, appellant has failed to pierce the veil of

derivative sovereign immunity afforded to Patton as city manager. *See generally*, *Patterson*, 301 Va. at 197 ("Allegations of gross negligence can pierce through a derivative-sovereign-immunity defense asserted by an otherwise immune government employee."); *Colby v. Boyden*, 241 Va. 125, 130 (1991) ("Under Virginia law, where, as here, a defendant's actions are clothed with sovereign immunity, a plaintiff must establish gross negligence in order to prevail.").[43] Accordingly, the circuit court did not err in sustaining Patton's demurrer and plea of sovereign immunity.[44] *See Patterson*, 301 Va. at 200 (finding "the circuit court did not err in concluding that [defendant] was entitled to the protection of derivative sovereign immunity and that the allegations of gross negligence were insufficient as a matter of law").

Likewise, the circuit court did not err in granting Lucas-Burke's demurrer and dismissing the gross negligence claim against her because appellant's pleadings did not adequately allege either duty or causation. Regarding duty, appellant asserts that Lucas-Burke's violation of noninterference provisions in the Portsmouth City Code constitutes breach of a legal duty owed to appellant.[45] This Court is not convinced by that argument and observes that appellant pleaded

---

[43] This Court addressed Patton's derivative sovereign immunity as city manager in the above section discussing Counts I and II for wrongful termination. "If an individual working for an immune governmental entity is entitled to the protection of sovereign immunity under the common law, he is not immunized from suit. 'Rather, the degree of negligence which must be shown to impose liability is elevated from simple to gross negligence.'" *Burns v. Gagnon*, 283 Va. 657, 677 (2012) (quoting *Colby*, 241 Va. at 128).

[44] As previously discussed, this Court concludes that the circuit court intended to memorialize its oral rulings from the bench on March 3 in its August 24 order. The failure to do so accurately is nothing more than a clerical error capable of being remedied on remand.

[45] Section 3.11 of the Portsmouth City Charter, titled "Noninterference in appointment or removals," instructs that

> [n]either the city council nor any of its members shall direct or
> request the appointment of any person to or the removal of any
> person from any office or employment by the city manager or by
> any of the manager's subordinates, or in any way take part in the

no facts linking Lucas-Burke's alleged criminal conduct to a duty owed to appellant under the City Code.

Notwithstanding that conclusion, this Court separately finds that appellant has not adequately pled facts establishing that Lucas-Burke's statements to city council members was a proximate cause of appellant's subsequent termination.[46]  First, the timeline of events shows only that appellant was terminated on November 16, 2020, more than two months after the statements Lucas-Burke made.  Second, those statements were made to members of the city council and the media, not to the city manager directly.  Only the city manager has the authority to make decisions about hiring or firing the police chief.  *See* Portsmouth City Charter, Sec. 5.02; Portsmouth City Code, Sec. 2-166, 27-1, 27-2.

Third, appellant's pleadings do not contain sufficient facts to conclude, without speculating, whether Pace's decision to terminate appellant was influenced by Lucas-Burke's statements.  Pace's official justification for the termination does not raise a reasonable inference that any political pressure, let alone Lucas-Burke's previous demands during Patton's tenure as city manager, had any effect on his decision to appoint a new police chief.  For these reasons,

---

appointment of or removal of officers and employees of the city except as specifically provided in this Charter.

The language of this section is substantially the same as Portsmouth City Code Section 2-33, titled "Interference with appointees of city manager."

[46] Applying principles of statutory construction, this Court does not read either Code Section 2-33 or Charter Section 3.11 to necessarily impose a duty on Lucas-Burke for which a violation constitutes an actionable breach.  Rather, those sections place a prohibition on the actions of city council members and provide that a violation of such constitutes a misdemeanor. None of the sections in Chapter 3 (City Council) address any "duties" of city council members other than the mayor, whose "duties" appear in Section 3.09.  In contrast, other sections of the City Charter and Code explicitly provide "powers and duties" for certain city officials, including the city manager.  *See also* Sections 4.02 (duties of the city clerk); 5.02 & 2-166 (duties of the city manager); 6.02 (duties of the city attorney); 7.02 (duties of city assessor); 7.1.02 (duties of city auditor); and 11.01 & 2-142 (duties of civil service commission to the police and fire departments).

appellant's complaint does not state a cause of action against Lucas-Burke for gross negligence; therefore, the trial court did not err in granting her demurrer and dismissing this claim.

Counts V, VI, and VII: Defamation Per Se

In her amended complaint, appellant alleges three separate counts of defamation per se against Blount, Lucas, and Lucas-Burke for public statements they made about appellant's character and fitness in her role as police chief. She assigns error to the circuit court's dismissal of those counts with prejudice in response to each appellee's renewed demurrer.

<em>Elements of a Prima Facie Case of Defamation</em>

In asserting a claim of defamation, a plaintiff must plead facts showing "(1) publication of (2) an actionable statement with (3) requisite intent." *Nestler v. Scarabelli*, 77 Va. App. 440, 453 (2023) (quoting *Jordan v. Kollman*, 269 Va. 569, 575 (2005)); *see also Theologis v. Weiler*, 76 Va. App. 596, 605 (2023) ("Not all false and disparaging statements about a person are defamatory."). If a plaintiff's alleged facts do not adequately establish all three elements, a cause of action for defamation does not exist. In order words, a demurrer should be sustained when the complaint pleads insufficient facts as to any one of the three elements. As explained below, appellant's amended complaint establishes a prima facie case of defamation only against Blount; the claims against Lucas and Lucas-Burke, respectively, do not sufficiently demonstrate actionability or the requisite level of intent.

   I. <u>Publication</u>

Starting with the first element, appellant alleges that Blount, Lucas, and Lucas-Burke made oral and written statements about her to various other individuals, including reporters and governmental officials. *See Jackson v. Hartig*, 274 Va. 219, 228 (2007) ("Virginia law allows a person who has been the subject of libel or slander to bring a cause of action for defamation.");

*Davis v. Heflin*, 130 Va. 169, 173 (1921) ("If a libel is published, or a slander communicated to some third person, the action accrues.").[47]

On June 11, 2020, and November 16, 2020, the media issued news articles discussing the monument incident, including statements purportedly made by Lucas asserting appellant's poor handling of the situation and its aftermath. *See James v. Powell*, 154 Va. 96, 112 (1930) ("It is not necessary that the published report be verbatim, but it must be substantially correct."). "It is well settled that the author or originator of a defamat[ory statement] is liable for a republication or repetition thereof by third parties, provided it is the natural and probable consequence of his act, or he has presumptively or actually authorized or directed its republication." *Weaver v. Beneficial Finance Co.*, 199 Va. 196, 199 (1957).

Following appellant's issuance of several arrest warrants for individuals present during the monument incident, including Lucas, Lucas-Burke made a speech to city council on August 17, 2020, demanding appellant's termination. Later that day, she expressed the same sentiments in an email that was sent to the news media from her city email account and that identified her as "Vice Mayor." She even posted a copy of the email on her social media (Facebook) account, which any member of the public could read. *See James*, 154 Va. at 114 (holding that "one who publishes" a defamatory statement "in a newspaper or magazine . . . evidences his intention that the readers shall read it").

Two days later, Lucas-Burke held a press conference at which both she and Blount made statements calling for city officials to terminate appellant from the position of police chief. Blount further sent a letter to the mayor and the members of city council on September 22, 2020, in which he criticized appellant's conduct as police chief both during and after the monument

---

[47] "Written defamation is libel; spoken is slander. We make 'no distinction between' libel and slander." *Nestler*, 77 Va. App. at 454 n.5 (internal citation omitted) (quoting *Fleming v. Moore*, 221 Va. 884, 889 (1981)).

incident. Because "published" in this context encompasses the communication of the defamatory statements to a third party through either direct speech or written materials, *see Jackson*, 274 Va. at 228; *Davis*, 130 Va. at 173, the amended complaint satisfies the first element as to each appellee.

II. Actionability

Turning to the second element, "[w]hether an alleged defamatory statement is actionable is a question of law to be reviewed de novo" on appeal. *Nestler*, 77 Va. App. at 452-53.[48] In doing so, this Court must determine whether the statement (a) "'is capable of being proved true or false, and (b) whether it has the requisite defamatory "sting" to one's reputation.'" *Bryant-Shannon v. Hampton Roads Community Action Program, Inc.*, 299 Va. 579, 585 (2021) (quoting *Handberg v. Goldberg*, 297 Va. 660, 558 (2019)).

To be "actionable," the alleged defamation must be a "false factual statement that concerns and harms the plaintiff or the plaintiff's reputation." *Lewis*, 281 Va. at 725. "A statement is not actionable if it 'does not contain a provably false factual connotation,' or if it does not contain the requisite defamatory 'sting.'" *Nestler*, 77 Va. App. at 453 (internal citations omitted) (first quoting *Fuste*, 265 Va. at 132; and then quoting *Schaecher*, 290 Va. at 92). The Supreme Court "has described the requisite defamatory 'sting' for an actionable claim as containing language that: 'tends to injure one's reputation'" "to a magnitude sufficient to render one odious, infamous, or ridiculous, or subject to disgrace, shame, scorn, or contempt." *Bryant-*

---

[48] "The trial court has the 'gatekeeping function' to determine as a matter of law' whether a statement is reasonably capable of defamatory meaning before allowing the matter to be presented to a finder of fact.'" *Theologis*, 76 Va. App. at 605 (quoting *Schaecher*, 290 Va. at 94).

*Shannon*, 299 Va. at 587 (quoting *Schaecher*, 290 Va. at 92, 101).[49]  "By contrast, 'language that is insulting, offensive, or otherwise inappropriate, but constitutes no more than "rhetorical hyperbole" is not defamatory.'"  *Theologis*, 76 Va. App. at 606 (quoting *Schaecher*, 290 Va. at 92); *see also Bryant-Shannon*, 299 Va. at 585 (holding that "[m]erely offensive or unpleasant statements are not defamatory" (alteration in original) (quoting *Schaecher*, 290 Va. at 101)).

The limited "per se" categories of defamatory words inherently establish the required defamatory sting if adequately pled.  These include words that falsely impute to a person (1) "the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished"; (2) an infection of "some contagious disease, where if the charge is true, it would exclude the party from society"; (3) "unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment"; as well as words that (4) prejudice a person "in his or her profession or trade."  *Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 713 (2006) (quoting *Fleming v. Moore*, 221 Va. 884, 889 (1981)).  Appellant primarily alleges that the statements made by Blount, Lucas, and Lucas-Burke fall into the latter two categories.[50]

Although "[a] defamatory statement may be made 'by inference, implication or insinuation[,]'" *Fuste v. Riverside Healthcare Ass'n, Inc.*, 265 Va. 127, 132 (2003), "[s]peech that does not contain a provably false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person, are not actionable," *Tronfeld*, 272 Va. at 714

---

[49] "In evaluating whether a statement carries enough sting, courts 'take all inferences in favor of the plaintiff, but such inferences cannot rise above the language of the documents or statements themselves.'"  *Theologis*, 76 Va. App. at 605-06 (quoting *Schaecher*, 290 Va. at 93).

[50] *See also Fuste v. Riverside Healthcare Ass'n, Inc.*, 265 Va. 127, 132 (2003) ("At common law, defamatory words that 'prejudice [a] person in his or her profession or trade' are actionable as defamation per se." (alteration in original) (quoting *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 7 (1954))).

(citing *Yeagle v. Collegiate Times*, 255 Va. 293, 295 (1998)).[51]  Likewise, "[s]tatements that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion" protected by the First Amendment of the United States Constitution.  *Id.*  This Court is mindful, however, that "[s]imply couching . . . statements in terms of opinion does not dispel [factual] implications."  *Schaecher*, 290 Va. at 103 (quoting *Raytheon Tech. Servs. Co. v. Hyland*, 273 Va. 292, 303 (2007) (alterations in original).[52]  Therefore, "[w]hether an alleged defamatory statement is one of fact or opinion is a question of law . . . properly decided by the court instead of a jury."  *Tronfeld*, 272 Va. at 714; *see also Hyland v. Raytheon Tech. Servs. Co.*, 277 Va. 40, 48 (2009) ("[O]nce a trial judge has determined that an allegedly defamatory statement is capable of being proved false, the jury's function is to evaluate the evidence presented and to determine whether the plaintiff has met her burden of proving that the allegedly defamatory statement is false.").

III.  Intent

Finally, the third element in a defamation claim is the speaker's intent in making the defamatory statement.  The requisite level of intent that must be established "depends, in part, on whether [the] plaintiff is a public or private figure."  *Jackson*, 274 Va. at 228.  Since its ruling in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the United States Supreme Court has prohibited "public official[s] from recovering damages for defamatory falsehoods related to [their] official conduct except upon proof that the defamatory statement was made 'with "actual

---

[51] Only statements "'capable of being proven true or false' . . . are actionable in defamation."  *Tronfeld*, 272 Va. at 715 (quoting *Chaves*, 230 Va. at 118).

[52] This Court further acknowledges that the United States Supreme Court has "refused to 'create a wholesale defamation exemption for anything that might be labeled "opinion."'"  *Raytheon*, 273 Va. at 303 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990)).  Rather, "opinions may be actionable where they 'imply an assertion' of objective fact."  *Id.* (quoting *Milkovich*, 497 U.S. at 21).  As a result, considering an allegedly defamatory statement "as a whole . . . is vital to a determination of the truth or falsity of a defamation claim."  *Id.* at 47.

malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.* (quoting *Sullivan*, 376 U.S. at 279-80).[53] It has also extended the requirement of proof of actual malice to cases in which "a political candidate asserts a claim for damages allegedly caused by defamatory statements touching on his fitness for office." *Id.* (citing *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271-72 (1971)).

"In order to establish actual malice, a plaintiff 'must demonstrate by clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement.'" *Id.* (quoting *Jordan*, 269 Va. at 577).[54] "Upon review, the appellate court 'must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity.'" *Shenandoah Pub. House, Inc. v. Gunter*, 245 Va. 320, 325 (1993) (quoting *Bose Corp. v. Consumers Union, Inc.*, 466 U.S. 485, 514 (1984); *Gazette, Inc. v. Harris*, 229 Va. 1, 19 (1985)). In the case at hand, the circuit

---

[53] Although *Sullivan* did not "determine how far down into the lower ranks of government employees the 'public official' designation would extend[,]" 376 U.S. at 283 n.23, it made clear that such designation "cannot be thought to include all public employees," *Hutchinson v. Proxmire*, 443 U.S. 111, 119 n.8 (1979). As a result, "courts are to determine who is a 'public official' in accordance with 'the purposes of a national constitutional protection,' and not by reference to state law standards." *Richmond Newspapers, Inc. v. Lipscomb*, 234 Va. 277, 284 (1987) (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 84 (1966)).

[54] "[I]n the context of the actual malice inquiry, a duty to investigate the accuracy of one's statements does not arise until the publisher of those statements has a high degree of subjective awareness of their probable falsity." *Jackson*, 274 Va. at 230. Similarly, "[w]hile 'it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry,' proof of a media defendant's ill will toward a public figure plaintiff is, without more, insufficient to establish knowledge of falsity or reckless disregard for the truth." *Jackson*, 274 Va. at 231 (quoting *Harte-Hanks Commc'ns Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)). *Compare St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."), *with Harte-Hanks*, 491 U.S. at 692 ("Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category." (internal citation omitted)).

- 49 -

court made no factual finding of appellant's status and appellees contest her unsupported assertion that she is not a public figure. Thus, to assess whether the complaint sufficiently pleads the requisite intent, this Court must first determine whether appellant was a public or private figure at the time the alleged defamatory statements were made.

This Court finds that appellant has not pled any facts to support her bare assertion that she is not a public figure. In fact, the complaint and accompanying exhibits demonstrate the opposite—that appellant held a position of "such apparent importance that the public ha[d] an independent interest in [her] qualifications and performance . . . beyond the general public interest in the qualifications and performance of all government employees . . . ." *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966).[55] The United States Supreme Court recognized in *Rosenblatt* that the designation of "public official" "applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Id.* at 85.

As police chief, appellant held a position of public trust and was responsible for managing the police department, subject to direction from the city manager.[56] The authority and visibility that comes with that position is inextricably linked to the public's perception of the police force—the chief's reputation inherently reflects upon the department she leads. That appellant was appointed rather than elected to that position does not detract from her level of influence over public controversies or government policy, as demonstrated by her actions

---

[55] *See also Shenandoah*, 245 Va. at 324 ("In defamation actions based on statements regarding matters of public concern, actual malice must be proved before presumed or punitive damages can be awarded.").

[56] Appellant's employment contract with Patton, signed on June 21, 2019, provides that she "will serve at the pleasure of and report directly to the City Manager" as "Police Chief for the City of Portsmouth."

following the monument incident. Accordingly, this Court must assess whether appellant sufficiently pled actual malice in each of her defamation claims.

*Appellees' Alleged Defamation*

Having considered each of the statements made by each appellee, this Court concludes that appellant has established a prima facie claim of defamation only against Blount. *See Lewis*, 281 Va. at 725 ("In determining whether a statement is one of fact or opinion, . . . a court must consider the statement as a whole."); *Hyland*, 277 Va. at 48 ("[T]he factual portions of an allegedly defamatory statement . . . must be considered in view of any accompanying opinion and other stated facts."). The pleadings contain sufficiently definite facts of publication, actionability, and intent to survive Blount's demurrer at this stage in the proceedings. The same cannot be said of the claims against Lucas and Lucas-Burke. Therefore, this Court affirms the circuit court's judgment sustaining Lucas's and Lucas-Burke's demurrers.[57]

I. Blount's Statements (Count V)

The defamation claim against Blount in appellant's amended complaint is based on his "remarks at the August 19, 2020 press conference" and the statements in his September 22, 2020 open letter to the mayor and members of city council.

---

[57] Without rendering any opinion as to whether appellees would qualify for immunity under Code § 8.01-233.2(A), this Court denies appellees' request for "reasonable attorney fees and costs" under subsection (C). Under that provision of Virginia's anti-SLAPP (Strategic Lawsuit Against Public Participation) statute, such fees and costs may be awarded only to a "person who has a suit against him dismissed . . . or otherwise prevails in a legal action, *pursuant to the immunity provided by this section*." Code § 8.01-233.2(C) (emphasis added). Therefore, not only is such an award discretionary but it is also inapplicable here where dismissal of the charges against Lucas and Lucas-Burke is not based on affirmative evidence of appellees' immunity under Code § 8.01-233.2(A). Rather, in affirming the circuit court's judgment sustaining Lucas's and Lucas-Burke's demurrers, this Court concludes only that appellant did not carry her burden of alleging sufficient facts in the amended complaint to state a cause of action.

At the press conference on August 19, Blount called for the "immediate resignation" of appellant based on her actions in connection with the monument incident, particularly her arrest of Lucas on August 17. He expressly told the press that the police department, "under the leadership of [appellant,] has thrown State Senator Louise Lucas in the mix . . . to impugn [her] character and make [her] look like [she] committed a crime." Blount made similar statements on behalf of himself and other members of the MLK Committee in his September 22 letter, including accusations that appellant "ignored a conflict of interest, displayed a dereliction of duty, falsified information, and withheld critical information from the City Manager, the Mayor and the City Council."[58]

Appellant's defamation claim against Blount thus presents factual statements of-and-concerning appellant that "are capable of being proven true or false" and that carry the requisite defamatory "sting." *Chaves*, 230 Va. at 118; *see also Handberg*, 297 Va. at 666 (holding that a plaintiff claiming defamation must show "that a defendant has published a false factual statement that concerns and harms the plaintiff or the plaintiff's reputation" (quoting *Hyland*, 277 Va. at 46)).[59] Blount's statements target appellant directly in her capacity as police chief and disparage her fitness to hold that office. They contain assertions of fact about her untrustworthiness, which appellant could prove false by introducing contradictory evidence at trial.[60] *See Tronfeld*, 272

---

[58] In the letter, Blount acknowledges that he "called for the immediate termination of [appellant]" at the August 19 press conference. After claiming that some people "may believe that was a retaliatory request," Blount purports to offer his defamatory statements as "the justifiable reasons why [appellant] should not be reinstated."

[59] This Court does not purport to hold that every single sentence in the September 22, 2020 letter constitutes a defamatory statement; rather, the letter as a whole serves as a sufficient ground for appellant's claim of defamation against Blount.

[60] This Court conceives that appellant could offer evidence demonstrating the falsity of the claims that she "decided to have her department police themselves"; "displayed a complete and utterly [sic] dereliction of duty"; "demonstrated that she didn't know her role or responsibility"; "falsely responded that the State Police had completed their investigation"; and

Va. at 714; *see also Schaecher*, 290 Va. at 103 ("[A]n accusation of lying and manipulating facts . . . can imply underlying facts, and 'opinions may be actionable where they "imply an assertion" of objective fact.'" (quoting *Raytheon*, 273 Va. at 303)).

Furthermore, those allegations are harmful to appellant's "'reputation in the common estimation of mankind'" and "vilifies, shames, or disgraces" her as Portsmouth's police chief. *Nestler*, 77 Va. App. at 454 (quoting *Schaecher*, 290 Va. at 92). "The false accusation of the commission of [a] criminal act generally is sufficient to establish an injury to the plaintiff's reputation." *Lewis*, 281 Va. at 726-27; *see also Fuste*, 265 Va. at 133 (finding actionable the statement that there were "concerns about [the doctors'] competence" because it "prejudice[d] the doctors in the practice of their profession" and "evidence could be presented to show whether there were, in fact, concerns about the plaintiff's competence"). And such charge need not be made in express terms if the words used "impute a criminal offense . . . in the plain and popular sense in which the rest of the world would naturally understand them." *Schnupp v. Smith*, 249 Va. 353, 361 (1995) (quoting *Moss v. Harwood*, 102 Va. 386, 388 (1904)).

In addition to the actionability of the alleged statements, appellant has pled sufficient facts of actual malice to overcome Blount's demurrer. "A plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence . . . and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 668 (1989). Within the context of her pleadings,

---

"chose not to share with the city manager, the mayor, nor city council the crucial and vital actions that would have long-term negative impact on the city, its image and its economy." For example, testimony from a VSP official could prove that appellant responded truthfully when informing the media on the status of the VSP's investigation into the monument incident. Indeed, appellant even alleges in the complaint that the VSP never "assumed control of any monument investigation" because a Lieutenant Colonel advised appellant "that he did not believe anything that occurred at the monument incident was an 'abuse of power,' the threshold for the VSP to fully investigate."

appellant's amended complaint demonstrates that Blount's defamatory statements were made, at the very least, with reckless disregard of their truth or falsity. Consequently, Blount cannot rely upon the immunity provided by Code § 8.01-233.2—Virginia's anti-SLAPP (Strategic Lawsuit Against Public Participation) statute—to support his demurrer.

In the interest of protecting citizens' right to free speech, Code § 8.01-233.2 bestows immunity "from tort liability" for persons whose statements, either "(i) regarding matters of public concern . . . communicated to a third party, [or] (ii) made at a public hearing before, or otherwise communicated to, the governing . . . bodies of any local government entity concerning matters properly before such body," are the sole basis for the tort claim. Code § 8.01-233.2(A).[61] Such immunity, however, does "not apply to any statements that the declarant knew or should have known were false or were made with reckless disregard for whether they were false." Code § 8.01-233.2(B). Thus, a person who makes statements with actual malice cannot receive the protection afforded by Code § 8.01-233.2. Here, because appellant's amended complaint sufficiently alleges that Blount made defamatory statements with actual malice, Code § 8.01-233.2 does not provide a basis for sustaining Blount's demurrer.[62]

_____

[61] The statute also immunizes statements "(iii) made by an employee against an employer where retaliatory action arising from such statements is prohibited . . . ." Code § 8.01-233.2(A).

[62] In coming to that conclusion, this Court does not suggest that Code § 8.01-233.2 may not be applicable at other points in the proceedings upon remand. Conceivably, after appellant presents evidence at a hearing or trial, Blount could move to strike on the grounds that his statements were immune from tort liability under Code § 8.01-233.2(A) and that appellant failed to prove malice, thereby rendering subsection (B)'s bar on immunity irrelevant.

## II. Lucas's Statements

Appellant challenges as defamatory statements attributed to Lucas by the media, purportedly made during her "interviews with the media on June 11, 2020, and November 16, 2020."

An online article about the monument incident, issued by the media group 10 On Your Side, contained quoted statements from Lucas's June 11 interview, including her belief that appellant should be fired "immediately" because she had "abdicated her responsibility to maintain peace and failed to uphold the law" during the protests. During the interview, 10 On Your Side asked Lucas about statements she made at the site of the protests, which were filmed and posted on her Facebook page. In the video, Lucas can be seen next to the confederate monument telling protestors and police officers that, "because the city owns this property[,]" peaceful protestors cannot be arrested "for being on city property." Lucas told 10 On Your Side that the monument was "nothing more than a symbol of racism to be rubbed in the faces of the black community every time we see it," but that she never advocated for vandalism or property destruction.

Appellant's amended complaint further alleges that, "[f]ollowing the dismissal of the charges against Lucas, Lucas made a statement to local news media that the charges against her were 'racist.'" Without attaching any supporting exhibits or providing additional context, appellant then appears to quote three paragraphs supposedly written by the media containing statements attributed to Lucas on November 16. According to appellant, Lucas "said police officers involved in the case had made 'a mockery of the justice system'" by bringing "bogus" charges against her and other Black community members. Presumably referring to the dismissal of her charges, Lucas "said she was grateful for the outcome" because it "gives people in the community hope that when they come to these courtrooms that they will be treated in a fair and

- 55 -

just manner, even though you may have a rogue police department who intends to criminalize the justice system against people like me."

Under a reasonable reading of the language used, this Court concludes that appellant has not stated a cause of action for defamation against Lucas. First, the only statement of-and-concerning appellant is Lucas's June 11 opinion that appellant "abdicated her responsibility to maintain peace and failed to uphold the law." *See Schaecher*, 290 Va. at 99 ("A pleading for defamation must allege or otherwise make apparent on the face of the pleading that the alleged defamatory statements are 'of and concerning' the plaintiff." (quoting *Dean v. Dearing*, 263 Va. 485, 488 (2002))). As presented by appellant, Lucas's alleged statements from November 16 refer to the police generally and make no specific mention of appellant. *See Yeagle*, 255 Va. at 295 ("[S]tatements which cannot reasonably be interpreted as stating actual facts about a person cannot form the basis of a common law defamation action.").

Appellant nevertheless asserts that Lucas's statements "insinuated that [appellant], as police chief, ran a racist . . . [and] 'rogue police department.'" This Court disagrees. Although a plaintiff "need not show that [s]he was mentioned by name in the publication[,]" a statement "is not actionable" "if the publication on its face does not show that it applies to the plaintiff." *Gazette*, 229 Va. at 37. Moreover, the Supreme Court has held that

> the "of and concerning" element of common law defamation cannot be satisfied as a matter of law by either the "small group theory" or allegations and evidence that readers of allegedly defamatory statements understood the statements referred to a member of the governmental group based solely on that person's membership in the identified governmental group.

*Dean*, 263 Va. at 490. Therefore, "[a] member of a governmental group against which an allegedly defamatory statement is made can sustain a common law action for defamation only if that member can show that statement specifically implicated that member or each member of the group." *Id.* at 489-90. Appellant's pleadings do not satisfy this standard. And in the absence of

- 56 -

additional context, this Court cannot conclude that Lucas's November 16 statements satisfy the of-and-concerning element required for a defamation action. *See Yeagle*, 255 Va. at 297 ("[I]inferences cannot extend the statements, by innuendo, beyond what would be the ordinary and common acceptance of the statement.").

Second, even were this Court to assume without deciding that the June 11 statement concerning appellant was actionable as defamation, appellant's claim still fails for insufficient pleadings of actual malice.[63] Appellant's conclusory assertions that Lucas "knew or should have known the statement[] to be false" and that Lucas "spoke with reckless disregard to the truth or falsity of the statement[]" are not supported by the facts.[64] To the contrary, the pleadings demonstrate that Lucas's statement was made on the heels of receiving information about the monument incident that could reasonably support a belief in the truth of her resulting statement.

Notably, in less than 24 hours, Lucas learned that two peaceful protestors had been arrested; went to the monument in person to champion the rights of the citizens to protest peacefully on city property; returned to her office to continue working; and was then informed shortly thereafter that a protestor had been injured because the police had failed to stop the crowd from removing pieces of the monument. By that point, Lucas was already aware that appellant was in charge of the officers on scene. In fact, appellant had even told Lucas on scene that the city manager forbid anyone from trespassing on the property. Based on that chain of events, this

---

[63] Because the November 16 statements do not concern appellant and therefore do not support a defamation cause of action, this Court need not reach the question of malice as to those statements. *Theologis*, 76 Va. App. at 605 (acknowledging this Court's "obligation to decide cases on the best and narrowest grounds available" (quoting *Esposito*, 74 Va. App. at 134)).

[64] Appellant also incorrectly states the standard for actual malice by alleging that Lucas "should have known" that the statement was false. The Supreme Court has repeatedly held that malice can only be proven by presenting clear and convincing facts showing "that the defendant made the statements knowing they were false or made them so recklessly as to amount to a willful disregard for the truth." *Gazette*, 299 Va. at 42.

Court cannot conclude that Lucas's criticism of appellant on June 11 was made maliciously. Accordingly, the circuit court's judgment sustaining Lucas's demurrer and dismissing this count is affirmed.

### III. Lucas-Burke's Statements (Count VII)

Appellant alleges defamation for the statements contained in Lucas-Burke's August 17, 2020 email, which was sent to city officials and posted on her public Facebook page.[65] In that email, Lucas-Burke decried appellant's "arrest of several members of the Portsmouth Community" and called for appellant's termination as police chief. She further stated that appellant's action—"moving to felony charge Portsmouth Citizens"—was "viewed by many (myself included) as a disrespectful act of insubordination to the City Manager" because appellant "blatantly disregarded the authority" of the city council, city manager, and city attorney.

"Insubordination" in its broadest sense refers to actions taken by a person in direct contradiction to proper commands given by a superior authority. *See, e.g.*, *Kennedy's Piggly Wiggly Stores, Inc. v. Cooper*, 14 Va. App. 701, 704 (1992) (affirming the trial court's finding that employee's remarks to his employer did not constitute "misconduct or insubordination" because they did "not show flagrant disrespect, nor deliberately defy proper authority"); *Arrington v. Murray*, 182 Va. 1, 5-6 (1943) (finding that an employee "would probably be discharged for insubordination" "if he refused to do the work" directed by his employer). Appellant also defines "insubordination" in her complaint as "defiance of authority and/or refusal to obey lawful orders." She even readily acknowledges having orchestrated the execution of several felony arrest warrants despite Patton ordering her not to do so.

---

[65] Appellant also alleges that Lucas-Burke made those same statements in her August 17, 2020 speech to city council members.

Nevertheless, appellant argues that her actions were not insubordinate because Patton's order was unlawful and "[o]n[]e cannot insubordinately disobey an illegal order." "To determine whether a statement can be reasonably understood as stating or implying actual facts, whether those statements are verifiable, and whether they are reasonably capable of defamatory meaning, we must examine them in context . . . ." *Schaecher*, 290 Va. at 93. Thus, the first question at hand is not whether appellant's actions, taken in defiance of her superior's commands, actually constitute insubordination, but rather whether Lucas-Burke's characterization of appellant's behavior is a provably false factual statement or merely an opinion.[66]

Conceivably, appellant could present evidence establishing the illegality of the orders she received from Patton, thereby demonstrating that her disregard of such orders was not an act of insubordination. Therefore, the second question this Court must answer is whether Lucas-Burke's statements were made with the requisite intent to sustain a claim of defamation. As discussed above, appellant's status as a public figure required her to plead actual malice by clear and convincing proof that Lucas-Burke "made the statements knowing they were false or made them so recklessly as to amount to a willful disregard for the truth." *Gazette*, 229 Va. at 42. The facts presented in the amended complaint do not satisfy this standard, nor do they prove the falsity of Lucas-Burke's belief that Patton's orders to appellant were lawful.

---

[66] *See Schaecher*, 290 Va. at 93 ("[I]t is a general rule that allegedly defamatory words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used."); *Shenandoah*, 245 Va. at 326 (finding no actionable defamation arising from the "use of the words 'escapes,' 'controversial,' and 'spared'" because plaintiff did not establish "that any of th[o]se words were false in the context in which they were used").

In the absence of sufficient proof of malice, appellant has not established a prima facie claim of defamation against Lucas-Burke.[67]  Accordingly, this Court affirms the circuit court's judgment sustaining appellee's demurrer and dismissing this count.

CONCLUSION

For the foregoing reasons, this Court affirms the circuit court's dismissal of appellant's claims against all appellees, except Blount, for failure to allege facts sufficient to establish a cause of action.  Accordingly, this Court hereby reverses that judgment only as to Blount, reinstates the claims against Blount for tortious interference and defamation per se, and remands the case for further proceedings consistent with this opinion.

*Affirmed in part, reversed in part, and remanded.*

---

[67] Under the doctrine of judicial restraint, this Court refrains from commenting on whether Lucas-Burke's position as vice mayor of the city council afforded a qualified privilege to her August 17, 2020 communications.  *See Cashion v. Smith*, 286 Va. 327, 337 (2013) (holding that whether "[a] qualified privilege attaches to '[c]ommunications between persons on a subject in which the persons have an interest or duty[]' . . . is a question of law" reviewed de novo on appeal (second alteration in original) (quoting *Larimore v. Blaylock*, 259 Va. 568, 572 (2000))).  This Court likewise declines to consider whether her alleged violation of Portsmouth City Charter, Section 3.11 denies her any otherwise applicable qualified privilege.